Sean FERRER, an Individual; and George Muller, Executor of the Estate of Audrey Hepburn, Plaintiffs,

v.

Diana MAYCHICK a/k/a Diana Foote, an Individual; Carol Publishing Group, Inc., a Delaware corporation; Carol Communications, Inc., a Delaware corporation; Reg Grundy Productions, Inc., a Delaware corporation, Defendants.

No. 95 Civ. 9738(MGC).

United States District Court,
S.D. New York.

Sept. 30, 1999.

Owen & Davis PC, by James H. Neale, Tamara Loomis, New York City, for plaintiffs.

Kirk M. Hallam, Beverly Hills, CA, for plaintiffs.

Beldock Levine & Hoffman LLP, Melvin L. Wulf, Brian E. Maas, New York City, for defendants Carol Publishing Group, Inc. and Carol Communications, Inc.

Jay R. Butterman, New York City, for defendant.

## OPINION

CEDARBAUM, District Judge.

Two of the defendants published a biography of the late film star Audrey Hepburn that they advertised as having been written with Hepburn's "full cooperation." Sean Ferrer, one of Hepburn's sons, and George Muller, the executor of her estate,

filed this suit complaining that the publishing defendants' promotional material for the biography falsely suggests that Hepburn authorized and collaborated in the book. The publishing defendants, Carol Publishing Group, Inc. and Carol Communications, Inc. (collectively, "Carol"), move for partial summary judgment dismissing plaintiffs' false advertising and endorsement claim under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).[1] For the reasons discussed below, Carol's motion is denied.

### BACKGROUND

Audrey Hepburn was for more than 40 years a major international celebrity and renowned humanitarian. She died on January 20, 1993. Plaintiff Sean Ferrer is Hepburn's elder son. Plaintiff George Muller is the executor of the estate of Audrey Hepburn under her Last Will and Testament and is named as a plaintiff in that capacity. Defendant Diana Maychick is the author of a biography entitled "Audrey Hepburn: An Intimate Portrait" (hereinafter, "the Maychick Book"). Defendant Carol Publishing Group, Inc. engages primarily in the business of book publishing and is the publisher of the Maychick Book. Defendant Carol Communications, Inc. also engages primarily in the business of book publishing. Defendant Reg Grundy Productions, Inc. is a Delaware corporation with offices in Los Angeles and is engaged in the business of television and film production.

Ferrer and the executor of Hepburn's estate brought this action for injunctive relief, declaratory judgment, and damages arising from certain statements on the dust cover of and in promotional advertising for the Maychick Book. The Maychick Book was researched while Hepburn was still alive and was published in late 1993, shortly after Hepburn died. The statements giving rise to this suit allegedly are false and misleading because they suggest that Hepburn actually collaborated with Maychick in writing the biography. Thus, plaintiffs argue that the statements falsely suggest endorsement or sponsorship by Audrey Hepburn.

The offending statements that appeared on the dust cover of Carol's 1993 hardcover release of the Maychick Book are the following:

> "When she began writing her biography of Audrey Hepburn, author Diana Maychick never dreamed she would have such *unprecedented access* to the reclusive and legendary star. Audrey Hepburn insisted that a proper biography could never be completed unless she was willing to share some intensely personal and painful memories. For the next year, Hepburn and Maychick spent *countless hours* together in conversation, as Audrey opened up about her childhood, her careers, and the loves of her life."

(Hallam Decl. Tab 10) (emphasis added).

Carol's fall 1993 catalogue described the Maychick Book as "[e]xhaustively researched, and based on more than *100 interviews* with Hepburn's friends and colleagues, as well as with the often reluctant star herself." (Hallam Decl. Tab 9) (emphasis added). Carol's 1993 press release for the Maychick Book's publicity tour tracked the language on the dust cover, stating that Maychick had "unprecedented access" to and spent "countless hours" in conversation with Hepburn.[2] (Hallam Decl. Tab 12). In addition, the heading of the Maychick Book's press release an-

---

**1.** The Notice of Motion appears to seek summary judgment on all of the plaintiffs' claims. (Notice of Motion at 2). However, Carol's memoranda of law show that Carol is only attacking the adequacy of the Lanham Act claim. (Dt.Mem. at 28 n. 14; Reply Mem. at 36–37). Moreover, at oral argument, Carol stated, "We did not bring a motion for summary judgment with respect to the state claims...." (Tr. at 46). Therefore, this decision deals only with the Lanham Act claim.

**2.** The press release stated:

"When Diana Maychick began researching and writing this biography of Audrey Hepburn she never dreamed she would have such unprecedented access to the reclusive and legendary star who many thought of as a real-life fairy princess. Audrey Hepburn

nounced: "Audrey Hepburn Gives Last Interviews and *Full Cooperation* To New Biography." (*Id.*) (emphasis added). The envelope for a promotional press kit that Carol distributed to members of the media and book-buying public also stated that Hepburn gave this work "full cooperation." (Hallam Decl. ¶ 12 and Tab 11).

Carol admits that it wrote the promotional statements on the dust cover (Plfs.' Request for Admission No. 1, Hallam Decl. Tab 38) and in the catalogue (Schragis Dep. at 157, 174) and it does not deny having written the other promotional statements.

Plaintiffs have produced evidence that such statements are understood in the publishing industry to mean that the Maychick Book was "authorized" by Hepburn. Maychick testified that in the publishing business, the phrase "full cooperation" is understood to mean that a biography was authorized. (*Id.* at 618). Also, plaintiffs submit book reviews which describe the Maychick Book as written with "support from Hepburn," (Hallam Decl. Tab 19) and "the benefit of Hepburn's cooperation" (*id.* at Tab 20). One review refers to the book as an " 'approved' bio" (*id.* at Tab 22).

Maychick testified that the book was not authorized by Hepburn, and Carol has not disputed the fact that the Maychick Book was not an "authorized biography" in industry parlance.

The only evidence of the extent of the contacts between Hepburn and Maychick consists of Maychick's deposition testimony that she spoke with Hepburn on the telephone three to ten times while researching or writing the Maychick Book, (Maychick Dep. at 252, 608, 788), that the duration of the calls varied from ten minutes to an hour and a half, (*id.*, at 258,

612–13), and totaled about three to five hours (*id.* at 643, 801). Although Maychick asserts that she tape-recorded some of her conversations with Hepburn, she has not produced any tapes, and she asserts that she has not been able to locate them. (*Id.* at 281–84, 287–88, 382–83).

Maychick testified to the effect that Carol's statements promoting her book were not accurate. She said at her deposition, "I never thought 'countless hours' was a description to describe our time together." (*Id.* at 610). She said that whether Carol's phrase "countless hours" was misleading is a "judgment call," and "in my judgment, I suppose it is misleading." (*Id.*)[3] Regarding the statement that Hepburn gave "full cooperation" to the book, Maychick said she thinks it is not true. (*Id.* at 618).

With respect to Carol's knowledge that Maychick did not actually speak on countless occasions with Hepburn, Maychick testified that she never told anyone at Carol that she had more than *three or four* telephone conversations with Hepburn discussing matters related to the book. (*Id.* at 612, 619) (emphasis added). She said that she never told anyone at Carol that she had Hepburn's "full cooperation." Instead, she "always told them that the book was an *unauthorized book, which is the opposite of full cooperation.*" (*Id.* at 617) (emphasis added). She testified that she never told anyone at Carol that Hepburn consented to Maychick writing her biography or using any of the information given in their telephone conversations to write a book about her. (*Id.* at 616). In addition, Ben Petrone, Carol's former publicity director, learned in connection with his work on the Maychick Book that Hepburn had once stated that she preferred not to have her biography written. (Petrone Dep. at 268).[4]

---

insisted that a proper biography could never be completed unless she was willing to share some intensely personal and painful memories. For nearly one year, Hepburn and Maychick spent countless hours together in conversation recounting the actress' life."
(Hallam Decl. Tab 12).

**3.** However, in response to an interrogatory served on her by Carol, Maychick states that "countless" is an accurate word to describe her conversations with Hepburn. (Wulf Aff. Ex.H).

**4.** On the other hand, Petrone also testified that Maychick told him at one point that she

Kevin McDonough, Maychick's editor, testified that he did not think that the hours of interviews that Maychick had with Hepburn were literally countless, but he believed that they were "countless in the sense of poetic, a hell of a lot." (McDonough Dep. at 293). However, the same editor also said that it was "never my understanding" that the book was "based on conversations with the subject." (*Id.* at 67). He also testified that he did not recall hearing any words that he would consider to be equivalent to or similar to "full cooperation" used in describing to him Hepburn's level of cooperation with the book. (*Id.* at 70).

Steven Schragis, the publisher and owner of Carol, testified that when he approved and edited the sentence in the Fall catalogue about "100 interviews," he believed that Maychick had had "*[a]t least two or three*" conversations with Hepburn. (Schragis Dep. at 177) (emphasis added). When asked about that sentence at his deposition, Schragis stated, with respect to interviews with Hepburn, "It's meant to be somewhat ambiguous." (*Id.* at 174). Then Schragis clarified that,

> "Ambiguity may have been the wrong word. I didn't want to imply that there had been 100 interviews with the star. That would have been clearly overstating the issue. But I did want to get the number 100 in there, and I didn't want—I did want to point out that there had been 100 interviews, not necessarily with Audrey Hepburn, but with people who knew her and her colleagues. That's why it was structured the way it was."

(*Id.* at 177). The book actually contains interviews of only 58 individuals in addition to Hepburn. (Wulf Aff. ¶ 4).

Approximately 33,000 hardcover copies of the Maychick Book with the statements on its dust cover were printed and shipped by Carol for distribution in the United States and Canada in November and December of 1993. (Bender Aff. ¶¶ 4, 5). Carol submits evidence that the book was

had engaged in "24 hours of recorded inter-

not reprinted by Carol again until 1996, when Carol published a paperback version which was printed and advertised without the promotional statements that are the subject matter of this lawsuit. (*Id.* ¶¶ 6, 7).

Plaintiffs contend that "Carol permitted the republication of the Book and its false advertising statements in 1994 and 1995 by licensee publishers ... and in 1994, entered into further agreements calling for republication of the Book and its false advertising statements in various countries around the world." (Pf. 56.1 ¶ 39) (citing Hallam Decl. Tabs 6 and 29–36). However, the evidence submitted, consisting largely of copies of licensing agreements for the Maychick Book, does not mention the advertising for the licensed republications of the book and does not show that any of the licensed republications were promoted with the same advertising statements that Carol used for its 1993 hardcover version. Thus, plaintiffs' claim is limited to the advertising for the 1993 hardcover version of the Maychick Book.

It is undisputed that Hepburn neither wrote nor authorized a biography of herself during her lifetime.

In the joint pretrial order, plaintiffs allege injury as follows:

> "As a result of the deceptive and misleading advertisement and promotions for the Book, Maychick and Carol have prevented the plaintiffs from profiting from an authorized biography of Ms. Hepburn and have greatly diminished the value of plaintiffs' cooperation in or endorsement of any biography of Ms. Hepburn."

(JPO ¶ 6.53).

To demonstrate that the promotional statements for the 1993 publication of the Maychick Book damaged plaintiffs' claimed right to issue the only biography of Hepburn that is endorsed either by Hepburn or themselves, plaintiffs have submitted the report of Howard Kamin-

views" with Hepburn. (Petrone Dep. at 48).

sky, their publishing industry expert. In Kaminsky's opinion, "the Audrey Hepburn Estate and family would act as an excellent source of material and assistance" in connection with a Hepburn biography. (Kaminsky Rpt. at 2). According to Kaminsky, prior publication of an authorized biography would have reduced the size of the advance that plaintiffs could have received for participating in and endorsing a biography of Hepburn in the period following Hepburn's death by approximately $500,000 to $750,000. (*Id.*)

There is no evidence that plaintiffs participated in and endorsed a biography of Hepburn that was available for publication during what their expert Kaminsky describes as the optimal period for publishing such a biography. Also, there is no evidence that the publishers whom plaintiffs approached after Hepburn's death turned them away or offered them reduced advances on the ground that an authorized biography had already been released. (Grann Dep. at 19; Carr Dep. at 12; Morris Dep. at 11, 22; Nevins Dep. at 22, 25, 27).

Plaintiffs did not prepare a written proposal for their own biography of Audrey Hepburn until November of 1997. (2/13/98 Ferrer Dep. at 8–9). After submitting a proposal to several publishing houses, Ferrer secured and accepted an offer from Pocket Books for an advance of $175,000 to write a memoir about his relationship with his mother. (*Id.* at 29).

Plaintiffs have not offered any evidence that the proposed memoir has been written.

### PROCEDURAL HISTORY

Plaintiffs filed this action in January of 1994 in the Central District of California. In May 1994, Judge Rea granted in part and denied in part a motion by all of the defendants to dismiss the complaint. (Order re: Motion to Dismiss, Hallam Decl. Tab 41). In explaining why he did not dismiss the Lanham Act claim, Judge Rea held that the First Amendment did not bar it and that whether the statements would confuse consumers about sponsorship by Audrey Hepburn was a factual question. (*Id.* at 6 n. 1.) He also found that plaintiffs pleaded adequate injury to support a claim under § 43(a) of the Lanham Act because "They own the right to publish the only 'authorized' biography of Hepburn, and the value of any authorized work has, if the allegations in their complaint are true, been diminished by defendants' false advertising." (*Id.* at 7.)

After conducting discovery, Carol moved for summary judgment on the ground that the statements were protected by the First Amendment because they were not made maliciously. In August 1995, Judge Rea issued an opinion denying the motion because there was sufficient evidence of the publishing defendants' knowledge of the misleading quality of the statements at the time of publishing to allow the case to go to a jury even if the actual malice standard were to apply. (Order Denying Motion for Summary Judgment, Hallam Decl. Tab 42 at 2).

In September 1995, the action was reassigned to Judge King, and in November 1995, Judge King transferred the action to the Southern District of New York.

### DISCUSSION

#### A. *Summary Judgement Standard*

Summary judgment is authorized when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The judge's role in summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This requires that the party opposing summary judgment "do more than simply show that there is some metaphysical doubt as to the

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## B. Standing

A genuine issue of disputed fact has been raised as to the accuracy of the statements.

Carol argues that, even if the statements are not accurate, plaintiffs lack standing to sue under section 43(a) of the Lanham Act because they have no reasonable basis for believing that they have an interest that has been or is likely to be damaged by the statements.

### 1. Law of the Case

■ Plaintiffs take the position that the standing argument was rejected earlier by Judge Rea and, under the doctrine of law of the case, it should not be revisited. Their argument is not persuasive. To the extent that Judge Rea's 12(b)(6) opinion finds that plaintiffs have standing, (and whether it does so is not clear, since it does not explicitly refer to the doctrine of standing), it does not preclude reconsideration of the standing issue on this motion because it was limited to the face of the complaint, whereas this motion turns on the evidence after the completion of discovery.

### 2. Commercial Interest, Injury and Causation

The language of section 43(a) is strikingly general, providing in relevant part, that:

Any person who, on or in connection with any goods ... uses in commerce any ... false or misleading representation of fact, which ... is likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods ... by another person, or ... in commercial advertising or promotion, misrepresents the nature ... of his or her ... goods ... shall be liable in a civil action *by any person who believes that he or she is or is likely to be damaged by such act.*

15 U.S.C. § 1125(a) (emphasis added). The statute thus appears to give standing to sue to "any person" who "believes" he or she is damaged or "likely to be damaged." *PPX Enters., Inc. v. Audiofidelity, Inc.,* 746 F.2d 120, 124 (2d Cir.1984). However, the courts have restricted standing to commercial parties with the potential for commercial injury. *Berni v. International Gourmet Restaurants of America, Inc.,* 838 F.2d 642, 648 (2d Cir. 1988).

■ In the Second Circuit, the two requirements for standing under section 43(a) are a reasonable commercial interest to be protected against the alleged false advertising, *PPX Enters.,* 746 F.2d at 125; *Berni,* 838 F.2d at 648, and a "reasonable basis" for believing that this interest "is likely to be damaged by the false or misleading advertising." *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir.1994); *see, e.g., Johnson & Johnson v. Carter–Wallace, Inc.,* 631 F.2d 186, 190 (2d Cir.1980). "The 'reasonable basis' prong embodies a requirement that the plaintiff show both likely injury and a causal nexus to the false advertising." *Ortho,* 32 F.3d at 694; *see also PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1112–13 (2d Cir.1997).

■ Carol argues that plaintiffs do not have standing because they cannot show a likely injury with a causal nexus to the contested promotional statements. A plaintiff need not demonstrate that it is in direct competition with the defendant or that it has definitely lost sales because of the advertising in order to show the injury and causation component of its claim. *Ortho,* 32 F.3d at 694. However, "the likelihood of injury and causation will not be

presumed, but must be demonstrated in some manner," *id.*, and it must be established by "a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two." *Id.* Certainly, a claimant may not rely on the purely emotional, non-commercial harm that might arise from being associated with the defendant's product to show a likelihood of injury. *See, e.g., Cecere v. R.J. Reynolds Tobacco Co.*, 98 Civ. 2011(RPP), 1998 WL 665334, at *2 (S.D.N.Y. Sept. 28, 1998) (dismissing false endorsement claim on face of the complaint because of failure to allege any plausible theory of commercial harm).

■ Although the question is a close one, plaintiffs have shown a reasonable basis for believing they are likely to suffer or to have suffered an injury to their alleged interest in writing the only Audrey Hepburn biography authorized by Hepburn or endorsed by her estate and family. Plaintiffs' publishing industry expert Howard Kaminsky opines that the second endorsed biography is made less valuable by the first.[5] Kaminsky's expert opinion is that, after publication of the Maychick Book, a biography endorsed by plaintiffs would be considered a second endorsed biography of Hepburn, and would be less valuable therefore. (Kaminsky Rpt. at 2). Thus, plaintiffs have proffered some evidence that they have a reasonable basis to believe that their commercial interest in endorsing and participating in a Hepburn biography is damaged or likely to be damaged by Carol's statements suggesting that Hepburn herself authorized the Maychick Book.

The exact damages figure that Kaminsky arrives at is not relevant; it is based on an improper assumption that plaintiffs' biography of Hepburn would have been published during the "optimum period" following Hepburn's death, despite plaintiffs' admission that they had no book or even a book proposal ready at that time. However, Kaminsky's opinion that the value of plaintiffs' interest in writing the first biography of Hepburn endorsed either by themselves or the actress has been injured by Carol's advertising the Maychick Book as if it were authorized by Hepburn raises a genuine issue of disputed fact about whether Carol's advertising has injured or is likely to injure plaintiffs' commercial interest in publishing a biography of Hepburn.[6]

## C. First Amendment

■ Carol argues in support of its motion that under the First Amendment, liability cannot be imposed for the speech at issue because there is no proof that the statements were made maliciously. Judge Rea has already addressed and rejected this argument on a motion for summary judgment. (Order Denying Motion for Summary Judgment, Hallam Decl. Tab 42). He determined that, even if the First Amendment requires a showing that the statements were made with actual malice, the case could not be dismissed on summary judgment because plaintiffs had demonstrated the existence of an issue of fact regarding whether Carol knew at the time that it published the Maychick Book that the claims made on the dust cover and in the promotional materials were false. There is no reason to reconsider Judge

---

5. Because Carol has not objected to the unsworn nature of Kaminsky's report, the report is considered on this summary judgment motion. 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738 at 372–77 (1998 ed.); *DeCintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 114 (2d Cir.1987) (Rule 56(e) defects are waived on appeal where no motion to strike is directed to them at the district court level); *Anhui Provincial Import and Export Corp. v.*

*Hart Enters. Int'l, Inc.*, 96 Civ. 128(LAK), 1996 WL 229872, at *4 n. 2 (S.D.N.Y. May 7, 1996).

6. This opinion does not reach the issue of whether the descendibility of Hepburn's publicity rights under California state law provides Hepburn's heirs with an interest sufficient to confer standing under the Lanham Act. This is a novel question which has not been expressly confronted by any court.

502

Rea's opinion. Here, application of the doctrine of law of the case is appropriate.

### D. Remaining Arguments

Carol's remaining contentions are without merit. Although Carol separates standing from proof of economic loss, the arguments are essentially the same and have already been addressed in the section on standing. With respect to Carol's argument that the statements are mere puffing, the statements attacked are not statements of opinion and accordingly cannot be dismissed as puffing. *See Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995); *Gillette Co. v. Wilkinson Sword, Inc.*, 89 Civ. 3586(KMW), 1991 U.S.Dist. LEXIS 21006, at **53–54 (S.D.N.Y. Jan. 9, 1991); *Potamkin Cadillac Corp. v. Towne Cadillac Corp.*, 592 F.Supp. 801, 802 (S.D.N.Y. 1984).

### CONCLUSION

For the foregoing reasons, Carol's motion for partial summary judgment dismissing plaintiffs' Lanham Act claim is denied.

SO ORDERED.