**NATIONAL RURAL TELECOMMUNICATIONS COOPERATIVE, Plaintiff,**

v.

**DIRECTV, INC., Hughes Communications Galaxy, Inc. Defendants.**

**Nos. CV 99–5666 LGB(CWX), CV 00–00368 LGB, CIV.00–2117 LGB, CIV 00–8672 LGB, CIV 01–6220 LGB.**

United States District Court, C.D. California.

May 22, 2003.

Order Granting Reconsideration in Part June 5, 2003.

John I. Lazar, Leonard D. Venger, Sam S. Puathasnanon, Manatt, Phelps & Phillips, Sharon Douglass Mayo, David S. Eisen, John J. Quinn, Jr., James D. Layden, Arnold & Porter, Elizabeth D. Mann, James T. Grant, McDermott, Will & Emery, Steven A. Ellis, Sidley, Austin, Brown & Wood, Los Angeles, CA, Dustin F. Hecker, Joseph P. Crimmins, Jon C. Cowen, Posternak, Blankstein & Lund, Boston, MA, Abbe David Lowell, Chadbourne & Parke, Thomas H. Yancey, Joseph R. Guerra, Thomas C. Green, Michael D. Warden, Michael A. Levy, Jennifer Tatel, Sidley, Austin, Brown & Wood, Washington, DC, Larry R. Feldman, Joel N. Klevens, Fogel, Feldman, Ostrov, Ringler & Klevens, Gregory A. Nylen, Jeffrey E. Scott, Raymond B. Kim, Greenberg Traurig, Santa Monica, CA, Michael Anthony Lindsay, Scott Stearns, Dorsey & Whitney, Minneapolis, MN, for Plaintiffs.

Michael E. Baumann, Steven E. Bledsoe, R. Alexander Pilmer, April L. Ammeter, Mark T. Cramer, Peter F. Smith, Richard K. Welsh, Christopher Lynn Frost, Robyn Eileen Bladow, Kirkland & Ellis, David S. Eisen, Ingrid V. Eagly,

Arnold & Porter, Los Angeles, CA, Lawrence C. Jones, Fogel, Feldman, Ostrov, Ringler & Klevens, Santa Monica, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DIRECTV'S SUMMARY JUDGMENT MOTION NO. 2

BAIRD, District Judge.

## I. INTRODUCTION

This matter involves five cases dealing with DIRECTV, Inc. ("DIRECTV") that have been consolidated before this Court.[1] Presently before the Court are four summary judgment motions filed by DIRECTV. By this Order, the Court addresses DIRECTV's second summary judgment motion ("Motion No. 2") dealing with the claims alleged by Pegasus Satellite Television, Inc. and Golden Sky Systems, Inc.[2] in case no. CV 00–368 and by the North Central Telephone Cooperative ("NCTC") and the Iowa Lakes Cooperative ("ILC") in case no. 00–2117.[3]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background[4]

### 1. The NRTC—DIRECTV business relationship

In April of 1992, the National Rural Telecommunications Cooperative ("NRTC") entered into an agreement, the DBS Distribution Agreement (the "DBS Agreement" or "Agreement"), with DIRECTV's predecessor-in-interest, Hughes

Communications Galaxy, Inc. ("HCG"). Declaration of Alexander Pilmer in Support of DIRECTV's Summary Judgment Motions ("Pilmer Decl."), Exh. 10, Agreement. Under the Agreement, HCG agreed to provide NRTC with the rights to the Premium Services.[5] Declaration of Michelle Morris King in Support of NRTC's Opposition to DIRECTV's Summary Judgment Motions ("King Decl."), Exh. 193, Ramo Depo. at 323:14–25; Exh. 169, Hartenstein Depo. at 331:17–332:4; see also Pilmer Decl., Exh. 10, Agreement § 2.07. After signing the Agreement, HCG commenced negotiations with the providers of the Premium Services, e.g., HBO and Showtime, so that such services would be available to NRTC and HCG in their respective territories. King Decl., Exh. 193, Ramo Depo. at 331:2–7; Exh. 149, Chapman Depo. at 103:19–105:12. In 1993, the United States Satellite Broadcasting Company ("USSB"), a competitor of HCG and NRTC, executed an exclusive agreement with the providers of Premium Services. King Decl., Exh. 176, Hubbard Depo. at 410:18–411:4. During 1993, HCG tried unsuccessfully to obtain access to the Premium Services by negotiating with USSB. King Decl., Exh. 193, Ramo Depo. at 334:19–335:21, 336:14–17, 336:22–337:19 and 338:3–25.

HCG's inability to obtain the rights to the Premium Services led to negotiations between NRTC and HCG, which resulted in the 1994 Amendment to the Agreement (the "1994 Amendment"). The 1994 Amendment states in part that:

---

1. The five cases are CV 99–5666, CV 99–8672, CV 00–368, CV 00–2117 and CV 01–6220.

2. Pegasus Satellite Television, Inc. and Golden Sky Systems, Inc. are collectively referred to as "Pegasus."

3. NCTC and ILC assert claims on behalf of themselves and as representatives of a class of all those similarly situated. Accordingly, the

plaintiffs in case no. 00–2117 are collectively referred to as the "Class."

4. The parties are intimately familiar with the facts surrounding this litigation; as such, the Court only recites here the facts that are pertinent to Motion No. 2.

5. "Premium Services" include HBO, Showtime, Cinemax and the Movie Channel.

[i]f HCG acquires the rights, in its sole discretion, to distribute HBO, Showtime, the Movie Channel or Cinemax, NRTC shall have the option, in its sole discretion, to substitute such programming for any one of the services listed on Exh. A on a service by service basis.

Pilmer Decl., Exh. 11, 1994 Amendment at ¶ 1.

In 1996, HCG assigned its rights and liabilities under the Agreement to DIRECTV, pursuant to a restructuring wherein DIRECTV Enterprises, Inc., the parent of DIRECTV, became a wholly owned subsidiary of Hughes Electronics. Pilmer Decl., Exhs. 73 & 74, Dun & Bradstreet Report re DIRECTV Enterprises, Inc. In December of 1998, General Motors, Hughes Electronics and USSB entered into a merger agreement (the "Merger Agreement"). Pilmer Decl.; Exh. 16. Pursuant to the Merger Agreement, USSB was merged into Hughes Electronics. *Id.* Upon the completion of the merger, Hughes Electronics succeeded to all the rights and obligations set forth in USSB's service contracts with the various providers of Premium Services, including HBO and Showtime. Pilmer Decl., Exh. 16, Merger Agreement at § 1.4. Hughes Electronics and DIRECTV entered into a Sales Agency Agreement, signed in December of 1999, which "authorizes and grants DIRECTV the non-exclusive right to market, sell and transmit" the Premium Services, previously distributed by USSB. Pilmer Decl., Exh. 15.

After the merger between USSB and Hughes Electronics in December of 1998, NRTC met with DIRECTV to discuss NRTC's purported substitution rights under the 1994 Amendment. King Decl., Exh. 192, Phillips Depo. at 575:10–579:17. DIRECTV took the position that NRTC's contingent right under the 1994 Amendment to substitute the Premium Services never vested because Hughes Electronics—and not DIRECTV—acquired USSB's rights to the Premium Services. Accordingly, DIRECTV declined to provide those services to NRTC. NRTC subsequently filed suit against DIRECTV.

### 2. PEGASUS AND THE CLASS

Pegasus and the Class are members of NRTC and are in the business of distributing direct broadcast satellite television services to rural America. King Decl., Exh. 3, Member Agreement. Following the execution of the DBS Agreement and with the approval of HCG, NRTC entered into separate "NRTC/Member Agreements for Marketing and Distribution of Direct Broadcast Service" ("Member Agreements") with its members and affiliates, such as Plaintiffs,[6] pursuant to which NRTC passes through the programming and distribution services to its Members. *Id.* The Members sell and distribute the DBS services to subscribers in their territories entering into separate Subscriber Agreements for this purpose. King Decl., Exh. 114, Subscriber Agreement.

Plaintiffs filed the instant suits against DIRECTV following the latter's refusal to pass on to NRTC, and thus to NRTC's Members, including Plaintiffs, the Premium Services it recently gained access to after the merger with USSB.

### B. The Instant Lawsuits and Motion No. 2

DIRECTV's Motion No. 2 is directed to case nos. 00–368 and 00–2117. In case no. 00–368, *Pegasus v. DIRECTV and HCG*,[7] Pegasus alleges the following claims against DIRECTV: 1) intentional interference with contractual relations, specifically the Member Agreements between NRTC

---

**6.** Pegasus and the Class are collectively referred to as the "Plaintiffs."

**7.** In this Order, DIRECTV and HCG are collectively referred to as DIRECTV.

and Pegasus, 2) intentional interference with prospective economic relationship as between Pegasus and existing and future subscribers, 3) intentional interference with contractual relations with equipment dealers, 4) intentional interference with prospective economic advantage as between Pegasus Satellite Television, Inc. and equipment distributors and dealers,[8] 5) violation of California Business and Professions Code § 17200, 6) misappropriation of trade secrets,[9] 7) declaratory relief as to the term of the DBS Distribution Agreement, 8) declaratory relief as to the status of DIRECTV–1R as a successor satellite and NRTC's right of first refusal, 9) declaratory relief as to Pegasus' proportionate share of the Launch Fees NRTC may receive from DIRECTV, 10) declaratory relief as to subscriber information, and 11) declaratory relief as to the Class's exclusive rights to distribute the Advanced Services in NRTC territories. *See* Second Amended Complaint in case no. 00–368, filed June 20, 2001 ("SAC 00–368").

In case no. 00–2117, *NCTC v. DIRECTV*, the Class alleges the following claims against DIRECTV: 1) intentional interference with contractual relations, specifically the Member Agreements between NRTC and the Class, 2) intentional interference with prospective economic relationship as between the Class and existing and future subscribers, 3) violation of California Business and Professions Code § 17200, 4) misappropriation of trade se-

crets,[10] 5) declaratory relief as to the term of the DBS Distribution Agreement, 6) declaratory relief as to the status of DIRECTV–1R as a successor satellite and NRTC's right of first refusal, 7) declaratory relief as to the Class's proportionate share of the Launch Fees NRTC may receive from DIRECTV, 8) declaratory relief as to subscriber information, and 9) declaratory relief as to the Class's exclusive rights to distribute the Advanced Services in NRTC territories. *See* Second Amended Complaint in case no. 00–2117, filed June 20, 2001 ("SAC 00–2117").

In Motion No. 2, DIRECTV requests partial summary judgment on the following claims: 1) claim 1 in case nos. 00–368 and 00–2117 (the "Interference with Member Agreements Claims")[11] and claim 2 in case nos. 00–368 and 00–2117 (the "Interference with Subscribers Claims")[12] and 2) claim 5 in case no. 00–368 and claim 3 in case no. 00–2117 (the "Section 17200 Claims").[13] DIRECTV also moved for summary judgment as to claims 3 and 4 in case no. 00–368. However, since those two claims were subsequently voluntarily dismissed by Pegasus, DIRECTV's summary judgment motion as to those two claims is deemed moot.

DIRECTV filed its moving papers in support of Motion No. 2 on September 11, 2002. Pegasus and the Class filed their respective oppositions on October 11, 2002.[14] DIRECTV filed its Reply on October 21, 2002.

---

**8.** Claims 3 and 4, which were alleged only by Pegasus Satellite Television, Inc., were dismissed on October 11, 2002 pursuant to a stipulation by the parties.

**9.** Claim 6 was dismissed on November 8, 2002 pursuant to a stipulation by the parties.

**10.** This claim was dismissed on November 8, 2002 pursuant to a stipulation by the parties.

**11.** Pegasus' claim 1 in case no. 00–368 is identical to the Class's claim 1 in case no. 00–2117.

**12.** Pegasus' claim 2 in case no. 00–368 is identical to the Class's claim 2 in case no. 00–2117.

**13.** Pegasus claim 5 in case no. 00–368 is identical to the Class's claim 3 in case no. 00–2117.

**14.** In its Opposition, Pegasus addresses DI-

## III. LEGAL STANDARDS

### A. Legal Standards

Rule 56 of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To avoid summary judgment, the non-movant must set forth specific facts showing that there remains a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The non-movant "may not rest upon the mere allegations or denials of the adverse party's pleading." *Id.* The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Id.* at 325, 106 S.Ct. 2548. If the non-moving party's evidence is merely colorable or is not significantly probative, then summary judgment may be granted. *Id.*

## IV. ANALYSIS

### A. Claims 1 and 2 in Case Nos. 00–368 and 00–2117

Preliminarily, the Court finds it helpful to elaborate on the nature of claims 1 and 2 asserted in case nos. 00–368 and 00–2117. In claim 1, the Interference with Member Agreements Claim, Pegasus and the Class allege that "DIRECTV's intentional breach of the [1992 DBS Agreement] by its refusal to provide NRTC with the Premium Services and Advanced Services as required under the terms of the [1992 DBS Agreement and its 1994 Amendment] caused the NRTC to breach its obligations under the Member Agreements to make this programming and services available to [Pegasus and the Class]." SAC 00–368 at ¶ 68 and SAC 00–2117 at ¶ 74. Pegasus and the Class further allege that "DIRECTV's intentional breach of the NRTC Agreement by its refusal to provide NRTC with its proportionate share of Launch Fees as required under the terms of the [1992 DBS Agreement and its 1994 Amendment] caused the NRTC to breach its obligations under the Member Agreements to pass these Launch Fees to [Pegasus and the Class]." SAC 00–368 at ¶ 70 and SAC 00–2117 at ¶ 76. As to claim 2, the Interference with Subscribers Claim, Pegasus and the Class allege that they have entered into agreements with existing subscribers, and reasonably expect to enter into agreements with future subscribers to provide "DBS Distribution Services including NRTC Programming Services which includes Advanced Services within the NRTC territory." SAC 00–368 at ¶ 76 and SAC 00–2117 at ¶ 82. Pegasus and the Class further contend that DIRECTV's refusal to provide NRTC with

RECTV summary judgment motion as to the Interference with Member Agreements and Subscribers Claims. The Class's Opposition addresses DIRECTV's summary judgment motion as to the Section 17200 Claims. Pegasus and the Class join in each other's oppositions.

the Premium and Advanced Services, coupled with DIRECTV's sale of the Premium Services and Advanced Services into Plaintiffs' exclusive territory and DIRECTV's misappropriation and misuse of Plaintiffs' Subscriber Information ... were intentionally designed to interfere with the prospective economic advantage that would inure to Plaintiffs" from selling the Premium and Advanced Services. SAC 00–368 at ¶ 78 and SAC 00–2117 at ¶ 84.

DIRECTV argues that, because it has a direct interest or involvement in the economic relationship at issue, claims 1 and 2 do not survive summary judgment. Additionally, DIRECTV contends that to prevail on claim 2, the Subscriber Interference Claim, Plaintiffs must, but cannot show, that DIRECTV acted unlawfully. The Court now addresses each of DIRECTV's two arguments.

### 1. DIRECTV's first argument: whether claims 1 and 2 fail because DIRECTV has a direct interest or involvement in the economic relationship at issue?

The dispute between the parties in the instant motion boils down to whether DIRECTV, as a third party beneficiary, can be held liable for tortious interference. This Court, in its December 5, 2000 Order denying DIRECTV's motion to dismiss Plaintiffs' claims 1 and 2 pursuant to Federal Rule of Civil Procedure 12(b)(6) stated:

> Defendants argue that, as third party beneficiaries to the Member Agreements, they cannot be liable as a matter of law for interfering with the Member Agreements. Defendants maintain that (1) one California case, *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* makes clear that only strangers or interlopers to a contract can be found liable on such a claim; (2) no case in California allows a third party beneficiary to be sued for tortious interference with con-

tract; and (3) Georgia courts have held that a third party beneficiary cannot be liable for tortious interference because such a party is not a stranger to the contract.

. . .

> While *Applied* can be interpreted to hold that direct contracting parties may not be sued for interference with their own contract, there are no grounds upon which to extend that holding to apply to third party beneficiaries.

. . .

> Since a third party beneficiary does not have a duty to perform under the contract and, thus, cannot be sued for breach, it is not a party to the contract under *Applied,* even if it has legitimate social or economic interests in the contract. As a noncontracting party, it can be sued for tortious interference with the contract.

> Accordingly, Defendants did not assume any obligations under the Member Agreements and, thus, are like any other strangers to the Agreements. Thus, *Applied* does not immunize Defendants, as third party beneficiaries to the Member Agreements, from tort liability.

> While the Court's research of California case law has not revealed any case specifically authorizing or entertaining a suit against a third party beneficiary for tortious interference, it has also failed to discover a case that squarely precludes such a claim. The Court holds that *Applied* does not preclude such a claim and the Court does not find Georgia's holding to the contrary to be either binding or persuasive precedent.

. . .

> Defendants have not presented the Court with any controlling authority holding that third party beneficiaries are immune from claims of tortious interference with contract.

King Decl., Exh. 82, December 5, 2000 Order at 11–15.

 In Motion No. 2, DIRECTV cites to a 2001 Ninth Circuit decision, *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir.2001), to argue that it should not be sued for tortious interference. Thus, the crux of the instant dispute is really whether this Court should revisit its decision in the May 2000 Order holding that a third party beneficiary can, under California law, be sued for tortious interference.[15]

In *Marin Tug*, the Ninth Circuit further defined a "third-party stranger" under California's "intentional interference business torts" and held that an entity with a "direct interest or involvement" in a business relationship cannot be a stranger to it as a matter of law.[16] Specifically, the Ninth Circuit noted that:

> California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party *stranger* to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually

liable for harm caused by pursuit of its interests.

*Marin Tug*, 271 F.3d at 832 (emphasis in original); *see also* 40 Cal. Jur.3d Interference with Economic Advantage § 8 (2002) (same).

*Marin Tug* arose from a dispute between Shell Oil and Marin Tug, a small fuel-delivery company, concerning the distribution of "bunker fuel." After the plaintiff, Marin Tug, sued Shell for allegedly contaminating one of its barges with polluted fuel, Shell refused to do business with Marin Tug or allow its fuel to be carried on Marin Tug's barges, thus disrupting Marin Tug's existing and prospective relationship with third parties. *Marin Tug*, 271 F.3d at 828. "The effect of Shell's refusal to deal was not only that Shell would no longer contract with Marin Tug but also that Marin Tug could no longer do business with third-party fuel brokers and consumers who otherwise would have hired it to transport Shell Oil." *Id.* Marin Tug then sued Shell for interfering with these relationships. The Ninth Circuit affirmed summary judgment against Marin Tug, finding that Shell can-

---

**15.** This Court, of course, "has the inherent power to reconsider or modify an interlocutory order at any time prior to the entry of judgment." *Murr Plumbing, Inc., v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir.1995). The Court is also mindful that, since its December 5, 2000 Order, it has twice found that DIRECTV has a "direct, continuing and substantial interest" in the relationship at issue. Additionally, DIRECTV's instant motion for summary judgment cites to evidence that was discovered following the December 5, 2000 Order. This Court is not bound by findings in its Rule 12(b)(6) orders because such orders are "limited to the face of the complaint, whereas this [Rule 56] motion turns on evidence after the completion of discovery." *Ferrer v. Maychick*, 69 F.Supp.2d 495, 500 (S.D.N.Y.1999).

**16.** During Oral Argument, on May 5, 2003, counsel for Plaintiffs argued that *Marin Tug* is

not on point because the Court there was addressing the tort of intentional interference with prospective economic advantage (the "IIPEA tort") and not the tort of intentional interference with contractual relations (the "IICR tort"). Preliminarily, the Court notes that there are two business torts alleged by Plaintiffs against DIRECTV: 1) intentional interference with contractual relations, specifically, the Member Agreements between NRTC and Plaintiffs, and 2) intentional interference with prospective economic relationship, specifically "the prospective economic advantage that would inure to Plaintiffs from selling Premium Services ... and other services to their existing and future subscribers." SAC in Case No. 00–368 at ¶ 67 and SAC in Case No. 00–2117 at ¶ 84. Thus, even if Plaintiffs are correct that *Marin Tug's* holding is limited to the IIPEA tort, which as discussed *infra* they are not, it would still apply to their second business tort claim.

not tortiously interfere with those relationships, in part because Shell was not a stranger to them.[17] In reaching that conclusion, the Ninth Circuit evaluated whether Shell had any interest or involvement in the relationships with which it had allegedly interfered. The Ninth Circuit found that Shell's status as a non-party to the disrupted relationships did not affect its status as a non-stranger to them: "We are not dissuaded from this conclusion by the fact that in some instances the actual contracts were between Marin Tug and the buyer, not with Shell." *Id.* at 834. "Such contract," the Court reasoned, "no less than those in which Marin Tug contracted directly with Shell, required direct, active involvement—the loading of Shell's oil onto Marin Tug's barges." *Id.* Because Marin Tug's relationships with the third parties depended on Shell cooperation, the Ninth Circuit held that Shell was not a stranger to the relationships with which it had interfered: "[b]ecause the economic relationship between Marin Tug and the buyer depends on Shell's cooperation, Shell is not easily characterized as a stranger to that relationship." *Id.*

Based on the foregoing, and pursuant to *Marin Tug*, the threshold test for determining whether a defendant is not a stranger to an economic relationship, and thus cannot be liable for tortious interference, is whether such defendant *has a direct interest or involvement in that relationship.*

This Court has previously held that DIRECTV "has a direct interest in the [Member] Agreements," because DIRECTV "may be obligated to assume NRTC's rights and obligations under the Member Agreement" and is "a third party beneficiary of the entire Member Agreement." Pilmer Decl., Exh. 5, May 9, 2001

Order denying Pegasus and NRTC's motion to dismiss DIRECTV's counterclaims at 7:15–21; 8:10–15. Additionally, the Class has stipulated to the fact that "DIRECTV has a direct, continuing, and substantial interest in the delivery of the DBS Services (as defined in the Member Agreement)." Pilmer Decl., Exh. 1, Joint Stipulation and Order Re Substitution of Class Representative and Clarification of Class Membership at 3:11–12. The Class also agreed that "DIRECTV shall be permitted to protect its interests arising under or related to the Member Agreement...." *Id.* at 3:13–17.

DIRECTV's interest and involvement is also evident from the terms of the Member Agreements. For example, Plaintiffs must obtain DIRECTV's prior written consent before they assign or amend their contracts with NRTC. Pilmer Decl., Exh. 12, Member Agreement ¶ 19. The form contract also provides that confidential information may be disclosed to DIRECTV and that DIRECTV can have a proprietary interest in subscriber information. *Id.*, ¶¶ 20(a)(ix) & 20(b). The Member Agreement enables DIRECTV to terminate services to a member directly for non-payment, *id.* at ¶ 4(h), to obtain indemnification from a member, *id.* at ¶ 8(b), and to terminate illegal programming, *id.* at ¶ 8(c). The recitals to the Member Agreement set forth that DIRECTV will obtain and transmit the television programming that Plaintiffs will sell to their subscribers. *Id.* at 1. In Pegasus' own words, "DIRECTV's success—and accordingly ours—depends in large part on its ability to select popular programming and acquire access to this programming on favorable terms." Pilmer Decl., Exh. 22, Pegasus' December 21, 2001 SEC Form 10K at 16. Such evidence is of signifi-

---

**17.** The Ninth Circuit also found that Shell's refusal to deal with Marin Tug was not inde-

pendently unlawful. *Marin Tug,* 271 F.3d at 834.

cance since the Ninth Circuit in Marin Tug made clear that where, as here, Plaintiffs' business depends on the "direct, active involvement" or "cooperation" of the defendant, a plaintiff cannot state a claim for interference with that relationship under California law. *Marin Tug,* 271 F.3d at 832.

Plaintiffs also admit that they share a "mutual economic interest" with DIRECTV in the subscribers to the DIRECTV service in their service areas. Both Plaintiffs and DIRECTV obtain additional revenue from each and every new subscriber to DIRECTV programming. In Pegasus' own words, "the participating members and affiliates are required ... to remit to DIRECTV a 5% fee on subscription revenues." Pilmer Decl., Exh. 22, Pegasus' December 31, 2001 SEC For, 10–K at 10. Pegasus executives also recognize DIRECTV's interest: "We have a subscriber and you have money. Because every time we have a new subscriber, you get money, 'you' being DIRECTV." Pilmer Decl., Exh. 80, Chrate Depo. at 119:9–11.

Plaintiffs argue that this Court may ignore as "dicta" the Ninth Circuit language in *Marin Tug* that a stranger cannot be an entity with a "direct interest or involvement" in the "economic relationship" allegedly interfered with.[18] Pegasus' Mem. of P's & A's in Opposition to DIRECTV's Motion No. 2 at 10:17. Given the Ninth Circuit's clear identification of the stranger analysis as one of the core principles of California law that "undergird" the decision that "plaintiffs here cannot make out a case" for tortious interference, *see Marin Tug,* 271 F.3d at 832, the Court disagrees with Plaintiffs' characterization that such statements are dicta.[19] In a section of its opinion entitled "The Principles Applicable Here," the Court noted that it reached its decision by looking at "this area of California tort law" as a "whole ...[,] concentrating on results as well as reasoning." *Marin Tug,* 271 F.3d at 832. The Court then stated its holding: "we conclude that the plaintiffs here cannot make out a case" for tortious interference. *Id.* The court then clarified the basis for its holding by stating that "California law points toward three principles that, taken together, undergird that conclusion." *Id.* The second principle articulated by the Ninth Circuit is the definition of who is not a "stranger" and thus not subject to liability for intentional interference. *Id.* The Ninth Circuit carefully explained why Shell was not a stranger: 1) Shell had a "direct, active involvement" in "the loading of Shell Oil onto Marin Tug's barges"; 2) "the economic relationship between Marin Tug and the buyer of any Shell oil shipped on Marin Tug's barges depends on Shell's cooperation;" and 3) "Shell and Marin Tug had a mutual economic interest in delivering the oil" and "were dependent upon each other to do so." *Marin Tug,* 271 F.3d at 834.

Plaintiffs also argue that *Marin Tug* is distinguishable because DIRECTV allegedly has contractual obligations that give it "no 'option' whether to provide programming to Plaintiffs in the future—[DIRECTV] is contractually obligated to the NRTC to do so. The relationship inter-

---

**18.** Dictum is defined as a "judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision." *In re Hoskins,* 262 B.R. 693, 704 (Bkrtcy.E.D.Mich.2001) (citing Black's Law dictionary (7th Ed.1999)).

**19.** Even if the "stranger" test in *Marin Tug* was dicta, it is still entitled to great weight. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("although technically dicta, ... an important part of the Court's rationale for the result it reache[s] is entitled to greater weight.").

fered with, the Member Agreement between NRTC and the Members, does not require DIRECTV's 'cooperation,' or election to participate, to be effectuated, in the sense that term is used in *Marin Tug*." Pegasus' Mem. of P's & A's in Opposition to Motion No. 2 at 11:16–20. Such an analysis, however, appears nowhere in *Marin Tug* or any other case cited by Plaintiffs. The Ninth Circuit did not discuss the voluntary or involuntary nature of Shell's interests and involvements in the context of applying the "stranger" test. After finding Shell was not a "stranger," the Ninth Circuit noted: "We are not dissuaded from this conclusion by the fact that in some instances the actual contracts were between Marin Tug and the buyer, not with Shell." "Such contracts," the Court reasoned, "no less than those in which Marin Tug contracted directly with Shell, required direct, active involvement—the loading of Shell's oil onto Marin Tug's barges." *Id.* at 834. The Ninth Circuit found the "involvement"—"the loading of Shell's oil"—is the same whether or not Shell contracted with Marin Tug. Thus, Plaintiff cannot distinguish *Marin Tug*, from this case on the ground that "the type of cooperation" in the former did not involve a "preexisting contractual obligation."

Additionally, Plaintiffs do not explain how DIRECTV's economic interest in delivery of the DIRECTV service can be distinguished from Shell's interest in the delivery of its fuel. Plaintiffs do not dispute that they are dependent on DIRECTV to deliver the DIRECTV services. The Ninth Circuit found these interests relevant to its application of the stranger test. *See Marin Tug*, 271 F.3d at 834 (no interference where plaintiff and defendant "had a mutual economic interest in delivering" the product or service and "were dependent upon each other to do so.").

At Oral Argument, on May 5, 2003, counsel for Plaintiffs argued that *Marin Tug's* holding should be limited to the IIPEA tort, which is the claim the Ninth Circuit had before it. The Court disagrees. In setting forth the principles of California law regarding the "stranger" test, the Ninth Circuit stated that those principles applied to all "intentional interference business torts," and not just to the IIPEA tort. *See Id.* at 832. Intentional interference business torts include both the IIPEA and IICR torts. *See* 5 Witkin, *Summary of California Law*, Torts, Outline at p. 25, 1988 (listing the IIPEA and IICR torts under the heading of "Interference With Business Torts."); *see also Id.*, § 652 ("The tort of *interference with contract* is merely a species of the broader tort of interference with prospective economic advantage. Thus, while the elements are similar, the existence of a legally binding agreement is not necessary to a suit on the [IIPEA tort].") (emphasis in original) (internal quotations omitted).

Counsel for Plaintiffs also argued at Oral Argument that the California Supreme Court decision in *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 28 Cal.Rptr.2d 475, 869 P.2d 454 (1994), supports Plaintiffs' argument that DIRECTV can be sued for interfering with the Member Agreements and with the prospective economic relationships with subscribers. In support of their argument, Plaintiffs point to a portion of the *Applied* opinion where the California Supreme Court states that its holding does not suggest that the defendant "may not be held liable for direct interference" with another contract identified in the case to which the defendant was not a party. *See Applied*, 7 Cal.4th at 520–21, 28 Cal. Rptr.2d 475, 869 P.2d 454. However, in that same sentence, the court makes it clear that liability for interference with that contract would require "that each of the elements of the tort of interference

with contract [be] satisfied." *Id.* The Court then states: "We offer no opinion as to whether those elements can be satisfied in this case." *Id.* at 521, 28 Cal.Rptr.2d 475, 869 P.2d 454. One element of the tort identified by the Supreme Court is whether the defendant is a "stranger" with "no legitimate social or economic interest in the contractual relationship." *Applied,* 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454. Indeed, earlier in the text of the *Applied* opinion, the court states, consistent with the test articulated in *Marin Tug,* that "[t]he tort duty *not to interfere with the contract* falls only on strangers-interlopers who have no legitimate interest in the scope or course of *the contract's* performance." *Applied,* 7 Cal.4th at 514, 28 Cal.Rptr.2d 475, 869 P.2d 454 (emphasis added).

Based on the foregoing, the Court finds that DIRECTV has a direct interest and/or involvement in the Plaintiffs/NRTC and Plaintiffs/subscribers relationships; and thus, DIRECTV is not a "stranger" to such relationships.[20] Therefore, Plaintiffs interference claims fail as a matter of law. The Court, thus, grants DIRECTV's summary judgment motion as to Pegasus' claims 1 and 2 in case no. 00–368 and the Class's claims 1 and 2 in case no. 00–2117.[21]

## B. Plaintiffs' Claim 5 In Case No. 00–368 and Claim 3 in Case No. 00–2117 (the "Section 17200 Claims"):

Preliminarily, the Court finds it helpful to summarize the background principles governing claims under California Business & Professions Code section 17200. The Court will then address the substance of the summary judgment motion brought by DIRECTV.

Business and Professions Code section 17200 *et seq.* (known in California as the "Unfair Competition Law" or "UCL") prohibits the following five different types of wrongful conduct: (1) an "unlawful ... business act or practice" (2) an "unfair ... business act or practice;" (3) a "fraudulent business act or practice;" (4) "unfair, deceptive, or untrue or misleading advertising;" and (5) "any act prohibited by [Bus. & Prof. Code §§ 17500–17577.5]." Cal. Bus. & Prof.Code § 17200. Plaintiffs have alleged that DIRECTV engaged in the first three types of wrongful conduct under the UCL—"unlawful," "unfair," and "fraudulent" act or practice.

**20.** The Court also finds of some persuasive value the fact that other courts have held that a third-party beneficiary to a contract or someone who is not a "stranger" to such a contract cannot, as a matter of law, be sued for tortious interference with the contract. *See Iraola & CIA, S.A. v. Kimberly–Clark Corp.,* 325 F.3d 1274, 1284 (11th Cir.2003) ("[Plaintiff] has presented no evidence that [the defendants] were strangers to [the plaintiff's] relationships with [its former employees] Alpert and Jensen. Instead, the record demonstrates that [the defendants] were intimately entangled with the contract and the business relationship giving rise to and underpinning Alpert's and Jensen's relations with the plaintiff. As parties to an interwoven contractual agreement, [the defendants] do not qualify as strangers tortiously interfering with [the plaintiff's] contractual relations.");

*see also Southern Union Co. v. Southwest Gas Corp.,* 165 F.Supp.2d 1010, 1037 (D.Ariz. 2001) ("The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract."); *Atlanta Market Center Mgmt. Co. v. McLane,* 269 Ga. 604, 503 S.E.2d 278 (1998) ("[I]n order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise and underpinning the contract.").

**21.** The Court need not address DIRECTV's second argument that claim 2 must fail because Plaintiffs cannot show that DIRECTV acted unlawfully.

The UCL's definition of the various types of conduct that is considered to be wrongful is disjunctive. For example, "unlawful" business practices under the first prong of the definition are forbidden under the UCL even if the practices are not "unfair" or "fraudulent" under the second and third prongs respectively. *Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999). Regardless of which prong is at issue, "[w]hether a business act or practice constitutes unfair competition with Section 17200 is a question of fact." *Watson Labs. Inc. v. Rhone–Poulenc Rorer, Inc.*, 178 F.Supp.2d 1099, 1117 (C.D.Cal.2001).

The Court will now address the three bases of UCL violations that Plaintiffs allege.

### 1. The "unlawful" prong of the UCL

DIRECTV argues that "[s]ection 17200's 'unlawful' element includes business practices that allegedly violate a law or statute, but not a simple tort [or breach of contract] claim." DIRECTV Mem. of P's & A's in Support of Motion No. 2 at 22:12–13.

The "unlawful" prong of the UCL proscribes "anything that can be properly be called a business practice and that at the same time is forbidden by law." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal.App.4th 700, 717–18, 113 Cal. Rptr.2d 399 (2001) (internal quotations omitted). The "unlawful" practices pro-

hibited by the UCL "are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-made."[22] *Saunders v. Superior Court*, 27 Cal.App.4th 832, 838–39, 33 Cal.Rptr.2d 438 (1994).

In this case, Plaintiffs do not allege that DIRECTV violated any particular law. Instead, Plaintiffs argue that "a claim under the 'unlawful' prong of 17200 may be based on an underlying violation of common law, [*e.g.*, breach of contract],[23] and does not have to rise to the level of a statutory violation." In support of their argument, Plaintiffs quote one court's finding that a breach of contract "may in fact form the predicate for Section 17200 claims." Class's Mem. of P's & A's in Support of its Opposition to Motion No. 2 at 12:10–11 citing *Watson Labs.*, 178 F.Supp.2d at 1117 n. 12. Plaintiffs, however, omit the remainder of the sentence that establishes that a breach of contract may form the predicate for a section 17200 claim, *"provided it also constitutes conduct that is 'unlawful, or unfair, or fraudulent.'"*[24] *Watson Labs.*, 178 F.Supp.2d 1099 at 1117 n. 12 (emphasis added).

By emphasizing the ability to allege UCL violations of a "court-made" rule, Plaintiffs apparently ask this Court to find an "unlawful" action independent of any law. *See* Class's Mem. of P's & A's in Support of Opposition to Motion NO. 2. However, in the case cited by Plaintiffs, the "court-made" precedent that supported a claim of unlawful conduct was actually

---

**22.** A violation of "court-made" law is, for example, a violation of a prior court order. *See, e.g., Hewlett v. Squaw Valley Ski. Corp.*, 54 Cal.App.4th 499, 533–35, 63 Cal.Rptr.2d 118 (1997) (holding that violations of a court's temporary restraining order can be redressed as an "unlawful" act claim under the UCL).

**23.** Here, this would be the alleged breach by DIRECTV of the DBS Agreement with NRTC.

**24.** For this proposition, the *Watson Labs.* court cited to *Allied Grape Growers v. Bronco Wine Co.*, 203 Cal.App.3d 432, 249 Cal.Rptr. 872 (1988). In *Allied Grape*, a breach of contract was found to have created a supportable section 17200 claim only after that breach was found to have independently violated three statutes of the California Food and Agricultural Code. *See Allied*, 203 Cal.App.3d at 451–54, 249 Cal.Rptr. 872.

based on a trial's court's incorporation of prohibitions established by California Civil Code §§ 1670–71. *See Bondanza v. Peninsula Hosp. and Med. Center*, 23 Cal.3d 260, 266, 152 Cal.Rptr. 446, 590 P.2d 22 (1979).

Based on the foregoing, the Court finds that Pegasus' claim 5 in case no. 00–368 and the Class's section claim 3 in case no. 00–2117, to the extent such claims are based on the "unlawful" prong of the UCL, fail as a matter of law.

## 2. The "unfair" prong of the UCL

The second type of "wrong" proscribed by the UCL is "unfair" business acts or practices. Courts have defined "unfair" broadly in order to provide the courts with the maximum discretion to prohibit new schemes to defraud. *Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735, 740, 162 Cal.Rptr. 543 (1980); *see also People ex rel. Renne v. Servantes*, 86 Cal. App.4th 1081, 1095, 103 Cal.Rptr.2d 870 (2001) ("California's unfair competition law prohibits not only unlawful business practices but also unfair business practices. The statute is intentionally broad to give the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law."). The "test for determining an 'unfair' practice is [whether] the gravity of the harm to the victim outweighs the utility of the defendant's conduct." *Id.* at 1095, 103 Cal.Rptr.2d 870.

In its Motion No. 2, DIRECTV contends that the California Supreme Court recently adopted a new, more restrictive definition of "unfair" in "commercial" cases. DIRECTV's Mem. of P's & A's in Support of its Motion No. 2 at 22:17–22, citing *Cel–Tech Comm., Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 187, 83 Cal. Rptr.2d 548, 973 P.2d 527 (1999). In *Cel–*

*Tech*, the California Supreme Court held that the word "unfair" means:

> conduct that threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Cel–Tech Comm., Inc.*, 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527. The test annunciated in *Cel–Tech*, however, applies only to cases between direct competitors, not all "commercial" cases. *See Watson Labs.*, 178 F.Supp.2d at 1118 n. 13 ("Plaintiff is correct that the *Cel–Tech* test was expressly limited to actions between competitors."); *see also Smith v. State Farm*, 93 Cal.App.4th 700, 720 n. 23, 113 Cal. Rptr.2d 399 (2001) (stating that "[t]he [*Cel–Tech*] court made such comment, however, in the context of a dispute between *competitors*. Indeed, the *Cel–Tech* court concluded by articulating a specific and restrictive definition of 'unfair' that was to be applied whenever a plaintiff claimed to have suffered injury *"from a direct competitor's* 'unfair' act or practice..."") (emphasis in original).

DIRECTV first argues that it does compete with Plaintiffs and that Plaintiffs have not met the stricter test under *Cel–Tech*. DIRECTV further contends that even if Plaintiffs were not considered its competitors, their claim still fails because they are not consumers and thus, not entitled to the protection of the UCL. The Court will address each of DIRECTV's two arguments as follows: 1) whether DIRECTV competes with Plaintiffs; and if so, whether Plaintiffs have met the *Cel–Tech* test; and 2) if DIRECTV does not compete with Plaintiffs, must Plaintiffs be members of the general public to obtain the protection of the UCL "unfair" prong.[25]

---

**25.** Essentially, DIRECTV's two arguments can be summarized as follows: to prevail on a

**a. whether DIRECTV competes with Plaintiffs; and if so, whether Plaintiffs have met the *Cel–Tech* test?**

 Plaintiffs offer evidence to show that they do not compete with DIRECTV. For example, many DIRECTV employees testified that Plaintiffs and DIRECTV are not competitors and that it would not be in DIRECTV's interests to inhibit sales growth in Plaintiffs' territories. King Decl., Exh. 153, Courtney Depo. at 29:22–30:5,14–20, 31:14–32:21. Additionally, NRTC employees testified that they did not consider NRTC to be a competitor of DIRECTV. King Decl., Exh. 223, Berman Decl., at ¶ 5 ("NRTC and DIRECTV are not competitors. Rather, NRTC and its members and affiliates simply distribute many of DIRECTV's services in NRTC's territories."). Thus, Plaintiffs have raised a genuine issue of material fact whether Plaintiffs and DIRECTV are competitors. Plaintiffs, however, do not provide evidence to show a genuine issue of material fact whether DIRECTV meets the *Cel–Tech* test, *i.e.,* Plaintiffs have not raised a genuine issue of material fact that DIRECTV's conduct "threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws . . . or otherwise significantly threatens or harms competition." *See Cel–Tech Comm., Inc.,* 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527. Thus, even if Plaintiffs are found at trial to be competitors of DIRECTV, their UCL claims on the basis of

"unfair" business practices will necessarily fail.

**b. if DIRECTV does not compete with Plaintiffs, must Plaintiffs be members of the general public to obtain the protection of the UCL "unfair" prong?**

 The Court now turns to DIRECTV's second argument: assuming that DIRECTV does not compete with Plaintiffs, does their UCL "unfair" claim fail because they are not members of the general public? DIRECTV contends that the UCL "unfair" prong protects only competitors and the general public. Thus, DIRECTV argues, since Plaintiffs do not meet the strict *Cel–Tech* test and are not members of the general public, their claim must fail. In support of its argument, DIRECTV relies on *Watson Labs.* and on *Rothschild v. Tyco Int'l (US), Inc.,* 83 Cal.App.4th 488, 99 Cal.Rptr.2d 721 (2000). Preliminarily, the Court notes that the *Watson Labs.* Court was applying the *Cel–Tech* test among parties it deemed to be competitors, *see Watson Labs.,* 178 F.Supp.2d at 1118 n. 13; and thus *Watson Labs.* is inapplicable to DIRECTV's second argument dealing with Plaintiffs being non-competitors of DIRECTV. Additionally, the portion of the *Watson Labs.* opinion cited to by DIRECTV states:

> As stated in *Sun Microsystems, [v. Microsoft Corp.,* 87 F.Supp.2d 992 (N.D.Cal.2000) ]*supra,* '[Watson's] evidence merely indicates harm to its commercial interests, rather than harm to competition.'[26] For these reasons, the

---

claim under the UCL "unfair" prong, a plaintiff must:

 **1)** be a competitor of the defendant **and** prove that the Defendant's conduct meets the test set forth in *Cel–Tech;* or **2)** be a member of the general public **and** prove that the gravity of the harm to the plaintiff outweighs the utility of the defendant's conduct.

**26.** Incidentally, in paraphrasing this portion of *Watson Labs.,* DIRECTV states: "evidence that indicated harm to plaintiff's commercial interests, rather than showing harm to competition *or consumers,* does not establish 'unfair' conduct." Mem. of P's & A's in Support of DIRECTV's Reply at 20:16–18 (emphasis added). The term "consumers" is not part of the *Watson Labs,* opinion.

Court as factfinder : . . . could not reasonably find that Plaintiff has established that Defendants engaged in 'unfair' conduct under the *Cel–Tech* test.

*Watson Labs.*, 178 F.Supp.2d at 1119 (internal citations omitted). It is clear that the Court in *Watson Labs.*, having found that the parties were competitors, *see id.* at 1118 n. 13, was now merely holding that the plaintiff has not shown that the defendant's conduct is unfair under *Cel–Tech*. Nowhere does the Court suggest that a plaintiff must be a member of the general public in order to allege a UCL "unfair" claim against a non-competitor defendant. As to *Rothschild*, the second case cited by DIRECTV, the Court there did not have before it the issue currently in question— *i.e.*, whether a plaintiff must be a member of the general public in order to allege a UCL "unfair" claim against a non-competitor defendant. Instead, the issue there was whether the False Claims Act barred the plaintiff's UCL claim. *See Rothschild*, 83 Cal.App.4th at 494, 99 Cal.Rptr.2d 721.

Therefore, and based on the foregoing, the Court finds that DIRECTV has not carried its initial burden to show that the UCL "unfair" prong applies only to direct competitors or to the general public. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548 (holding that the moving party for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial). Indeed, California courts have consistently stated that the "unfair" prong of the UCL must be interpreted broadly. *See People ex rel. Renne*, 86 Cal.App.4th at 1095, 103 Cal. Rptr.2d 870.

Based on the foregoing, the Court: 1) grants DIRECTV partial summary judgment on the issue of whether its conduct meets the *Cel–Tech* test, *i.e.*, whether DIRECTV's conduct threatens an incipient violation of antitrust laws, violates the spirit or policy of those laws, or otherwise significantly threatens or harms competition; 2) denies DIRECTV's motion for partial summary judgment on the issue of whether it competes with Plaintiffs; and 3) denies DIRECTV's motion for partial summary judgment on the issue of whether Plaintiffs, if not competitors of DIRECTV, must be members of the general public to allege a UCL "unfair" claim.[27]

### 3. the "fraudulent" prong of the UCL

 A business practice is "fraudulent" if "members of the public are likely deceived." *Committee on Children's Television v. Gen. Foods. Corp.*, 35 Cal.3d 197, 214, 197 Cal.Rptr. 783, 673 P.2d 660 (1983). DIRECTV argues that "[b]ecause Plaintiffs are not members of the general public, Plaintiffs are not entitled to [section] 17200 protections for fraudulent actions." DIRECTV's Mem. of P's & A's in Support of its Reply to Motion No. 2 at 21:12–13. The Court agrees. *See South Bay Chevrolet v. GMAC*, 72 Cal.App.4th 861, 888, 85 Cal.Rptr.2d 301 (1999) (" 'Fraudulent,' as used in the statute, does

---

**27.** For purposes of trial on this issue, the threshold question to be submitted to the jury is whether Plaintiffs compete with DIRECTV. If the jury answers this question in the affirmative, then Plaintiffs' "unfair" UCL claim will necessarily fail since Plaintiffs have not, in their opposition to DIRECTV's Motion No. 2, raised a genuine issue of material fact whether DIRECTV's conduct "threatens an incipient violation of an antitrust law, or violates the spirit or policy of those laws . . . , or otherwise significantly threatens or harms competition." *Cel–Tech Communications, Inc.*, 20 Cal.4th at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527. If, on the other hand, the jury finds that Plaintiffs do not compete with DIRECTV, then the jury will be allowed to determine whether DIRECTV's conduct is "unfair" under the UCL, *i.e.*, whether the gravity of the alleged harm to Plaintiffs outweighs the utility of DIRECTV's conduct.

not refer to the common law tort of fraud but only requires a showing members of the public are likely to be deceived.") (internal quotations omitted); *see also Watson Labs.*, 178 F.Supp.2d at 1121 ("it is "necessary under the 'fraudulent' prong [of the UCL] to show deception to some members of the public, or harm to the public interest, and not merely to the direct competitor or other non-consumer party to a contract." "). Here, Plaintiffs have not made a showing that the public was impacted at all by DIRECTV's alleged actions.[28] Thus, Plaintiffs' claims under the "fraudulent" prong of the UCL fail as a matter of law. Therefore, the Court grants DIRECTV's summary judgment motion as to Pegasus' claim 5 in case no. 00–368 and the Class's claim 3 in case no. 00–2117, to the extent such claims allege violation of the "fraudulent" prong of the UCL.

## C. Damages Under Section 17200

 Damages are not available under the UCL. *See Bank of the West v. Superior Ct.*, 2 Cal.4th 1254, 1266, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). Section 17203, in contrast, authorizes courts to make orders "necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." Cal. Bus. & Prof.Code § 17203. In this case, Plaintiffs characterize the relief they are seeking under their UCL claims as "restitution of the funds wrongfully obtained by DIRECTV and profits lost due to DIRECTV's wrongful acts." Pegasus's SAC at 28:25–26 and the Class's SAC at 28:8–9 (same); *see also* Pilmer Decl., Exh. 17, Further Responses to Defs.' Damages Interrog. at 7:20–22 (as to the UCL claims, "Pegasus is entitled to recover as restitu-

tion all revenues DIRECTV has received and retained from Pegasus subscribers with respect to the sale of Advanced Services in Pegasus' territories, less costs properly chargeable against such revenues under the DBS Agreements.").

DIRECTV argues that the restitution Plaintiffs are seeking is really "camouflaged damages," and is thus barred under the UCL. DIRECTV's Mem. of P's & A's in Support of Motion No. 2 at 24:17. Conversely, Plaintiffs contend that they "seek disgorgement of DIRECTV's ill-gotten gains on Plaintiffs' claims under the UCL, not damages." Mem. of P's & A's in Support of the class's Opposition to Motion No. 2 at 22:22–23.

In a recent decision, *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003), the California Supreme Court addressed the issue of restitution under the UCL. In *Korea Supply*, the plaintiff Korea Supply Company ("KSC") was engaged in the business of representing manufacturers of military equipment in transactions with the Republic of Korea. *Id.* at 1141, 131 Cal.Rptr.2d 29, 63 P.3d 937. In the mid-1990's, the Republic of Korea solicited bids for military equipment known as synthetic aperture radar ("SAR"). *Id.* KSC represented MacDonald Dettwiler, a Canadian company, in its bid to obtain the contract award. *Id.* KSC expected a commission of over $ 30 million if MacDonald Dettwiler were awarded the contract. *Id.* In June 1996, the Korean Ministry of Defense announced that Loral, an American competitor of the Canadian company and the predecessor of defendant Lockheed, was awarded the contract, despite the fact that MacDonald Dettwiler's bid was about $ 50 million lower. *Id.* Beginning in 1998, and following an internal investigation by the

---

**28.** Sophisticated companies, like Plaintiffs here, are not members of the "general public." *See Rosenbluth Int'l., Inc. v. Superior* *Court,* 101 Cal.App.4th 1073, 124 Cal.Rptr.2d 844, 847 (2002).

Korean government, it was revealed that the SAR contract was awarded to Loral as a result of bribes and sexual favors. *Id.* Upon learning of these allegations, KSC sued Lockheed. KSC alleged, among other things, a claim under the UCL for which it sought disgorgement to it of the profits realized by Lockheed on the sale of the SAR to Korea. *Id.* at 1142, 131 Cal. Rptr.2d 29, 63 P.3d 937.

After discussing the difference between restitution and disgorgement, the *Korea Supply* court stated:

Under the UCL, an individual may recover profits unfairly obtained to the extent that these profits represent monies given to the defendant [by the plaintiff] or benefits in which the plaintiff has an ownership interest.

. . .

[A]n order for restitution is one compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest on the property or those claiming through that person. The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.

*Id.* at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937.

The *Korea Supply* court then went on to apply the principles it annunciated to the facts before it. First, the Court stated that "it is clear that plaintiff is not seeking the return of money or property that was once in its possession. KSC has not given any money to Lockheed Martin; instead, it was from the Republic of Korea that Lockheed Martin received its profits." *Id.* Second, the Court considered whether KSC has a vested interest in the money it seeks to recover. *Id.* The Court stated:

KSC itself acknowledged that, at most, it had an 'expectancy' in the receipt of a commission. KSC's expected commission is merely a contingent interest since KSC only expected payment if MacDonald Dettwiler was awarded the SAR contract. Such an attenuated expectancy cannot, as KSC contends, be likened to 'property' converted by Lockheed Martin that can now be the subject of a constructive trust. To create a constructive trust, there must be a res, an 'identifiable' kind of property or 'entitlement in defendant's hands.' As the United States Supreme Court recently said, a constructive trust requires 'money or property identified as belonging in good conscience to the plaintiff [which can] clearly be traced to particular funds or property in the defendant's possession.' The recovery requested in this case cannot be traced to any particular funds in Lockheed Martin's possession and therefore is not the proper subject of a constructive trust.

*Id.* at 1150–51, 131 Cal.Rptr.2d 29, 63 P.3d 937.

In this case, Plaintiffs are not seeking the return of money that was once in their possession.[29] Thus, the Court's inquiry

---

29. In their supplemental briefing submitted to the Court following oral argument, Plaintiffs advance the novel argument that the revenues they paid to DIRECTV under the Seamless Marketing Agreement satisfy the first ground for restitution under *Korea Supply*. *See* Supplemental Opposition at 5:2–24. However, Plaintiffs have never suggested in this case that their Section 17200 Claims are somehow premised, or even related, to unfair business practices by DIRECTV under the Seamless Marketing Agreement, an agreement that is the subject of Case No. 01–6220 (the "SMA Case"). Indeed, Plaintiffs had stipulated, on May 8, 2003, to sever the trial of the of the SMA Case from the other consolidated cases. On May 19, 2003, Plaintiffs lodged with the Court a proposed stipulation withdrawing their May 8, 2003 stipulation to sever the SMA Case.

must focus on the second test under *Korea Supply*—whether Plaintiffs have a vested interest in the money they seek to recover from DIRECTV.[30]

A "vested" interest is one that is "unconditional," "absolute," and "not contingent." *See* Black's Law Dictionary. A contingent interest, on the other hand, is dependent upon an uncertain future event. *See Victory Oil v. Hancock Oil Co.*, 125 Cal.App.2d 222, 231, 270 P.2d 604 (1954); *Loehr v. Ventura Cty. Cmty. Coll. Dist.*, 147 Cal.App.3d 1071, 1080–81, 195 Cal. Rptr. 576 (1983) (contrasting "earned but unpaid salary or wages which are vested property rights" with additional salary or benefits plaintiff might have earned had he not been terminated, which are not vested).

Plaintiffs argue that they have a vested interest in the money they are seeking from DIRECTV because it can be assumed that a) NRTC's contract rights exist, b) NRTC would have passed such rights to Plaintiffs, and c) Plaintiffs would have sold exactly the same amount of programming as DIRECTV for exactly the same amount of money. *See* Plaintiffs' Supplemental Opposition at 8:4–9:3. Assuming that NRTC prevails on its contract claims against DIRECTV and that NRTC passes the benefits it receives to Plaintiffs,[31] there remains the issue of whether the monetary relief sought by Plaintiffs is an identifiable res or fund in which they could claim a property interest for purposes of a claim for restitution. *See Korea*

*Supply*, 29 Cal.4th at 1150, 131 Cal. Rptr.2d 29, 63 P.3d 937. In the absence of an identifiable and vested interest in particular funds in DIRECTV's possession, Plaintiffs have a damage claim or a non-restitutionary disgorgement claim, both of which are barred under *Korea Supply*.

In this case, Plaintiffs' experts did not identify particular funds or monies to which Plaintiffs were allegedly entitled. Instead the experts estimated Plaintiffs' lost profits using percentages for estimated subscriber numbers and revenues. *See* Declaration of Amber E. Dean in Support of Plaintiffs' Supplemental Brief ("Dean Decl."), Exh. 170, Arnold Depo. at 406:3–15;[32] *see also id.*, Exh. 168, Hughes Report at 9–10.[33] Plaintiffs essentially seek to recover expectation damages for what they believe they would have obtained "if DIRECTV had performed in accordance with the DBS Agreements...." *See* Pilmer Decl., Exh. 17, Further Supplemental Responses to Defendant DIRECTV, Inc.'s Damages Interrogatories at 3:18–19 & 3:24–25. Indeed, Plaintiffs seek the same monetary relief as to their two business tort claims, which the Court has granted DIRECTV summary judgment on, and their Section 17200 Claim. *See Id.* Plaintiffs do not deny what they are doing; instead, they argue that damages and restitution claims can equal the same dollar amount. *See* Plaintiffs' Supplemental Opposition at 2:18–25, citing 1 D. Dobbs, *Dobbs Law of Remedies* § 4.1(1), at 555 (West 1993) [hereinafter "Dobbs"]. How-

---

**30.** Following Oral Argument on May 5, 2003, the Court requested additional briefing on the issue of "whether Plaintiffs have a vested interest in the revenues they are seeking under their Unfair Competition Claim, *i.e.*, whether the second test under *Korea Supply* ... has been met." *See* May 7, 2003 Minute Order. DIRECTV filed its Supplemental Brief on May 12, 2003. Plaintiffs filed their Supplemental Opposition on May 15, 2003. DIRECTV filed its Supplemental Reply on May 16, 2003.

**31.** NRTC claims the right, but not the obligation, to substitute Premium Services "in its sole discretion" for the programming. Pilmer Decl., Exh. 11, 1994 Amendment at ¶ 1.

**32.** Jerry L. Arnold is Pegasus' damages expert.

**33.** Christian W. Hughes is the Class's damages expert.

ever, Dobbs explains that "[r]estitution measures the remedy by the defendant's gain," whereas "damages" "measures the plaintiff's loss." Dobbs, § 4.1(1) at 555. DIRECTV has offered evidence to show that none of Plaintiffs' experts did attempt to measure DIRECTV's gain.[34] *See* Dean Decl., Exh. 167, Arnold report; Exh. 168, Hughes Report. To do so, the experts would be required to analyze DIRECTV's revenues and costs. Instead, Mr. Hughes looked at costs peculiar to the Class, such as the margin NRTC would have charged the Class for programming and the Class's incremental operations costs. *See* Dean Decl., Exh. 168 at 9–21. For his part, Mr. Arnold created a "premium services damages model" to calculate the "profits Pegasus would have received from selling the premium services...." *Id.*, Exh. 167 at 3. Mr. Arnold then went to look at costs peculiar to Pegasus, including the royalty rate Pegasus would have owed to DIRECTV and Pegasus' bad debt experience with its subscribers. *Id.* at 6. Neither Mr. Hughes nor Mr. Arnold attempted to analyze DIRECTV's costs for the sale of the Premium or Advanced Services.

The Court also notes that *Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000), a case cited in *Korea Supply* and relied on by Plaintiffs is distinguishable from the instant matter. In *Cortez,* the California Supreme Court allowed Ms. Cortez to recover as a restitutionary remedy wages for overtime she had actually worked. *Cortez*, 23 Cal.4th at 177, 96 Cal. Rptr.2d 518, 999 P.2d 706. The Court reasoned that "[t]he commonly understood meaning of 'restore' includes a return of property to a person from whom it was acquired, but earned wages that are due and payable pursuant to section 200 *et seq.* of the Labor Code are as much the property of the employee who has given his or her labor to the employer in exchange for that property as is property a person surrenders through an unfair business practice." *Id.* at 178, 96 Cal.Rptr.2d 518, 999 P.2d 706 (internal citations omitted). Here, Plaintiffs did not provide the disputed services to the subscribers; DIRECTV did. Ms. Cortez was entitled to restitution because her labor could not be restored to her, only her wages could. Here, since Plaintiffs have provided no services, *i.e.,* they have not had their "labor" taken away from them, there is nothing to restore to Plaintiffs.

Likewise, *U.S. v. Rodrigues,* 229 F.3d 842 (9th Cir.2000), another case relied on by Plaintiffs, is also not on point. In *Rodrigues,* the issue before the Ninth Circuit was whether the District Court was authorized under the Victim and Witness Protection Act to award restitution based on lost business opportunity. *See Id.* at 843. The Court held that a company (Saratoga) did not have a vested interest in projects in which it had not committed to invest in. However, the court noted that Saratoga's commitment letter in another project "was a thing of value," and stated

---

34. In support of their Supplemental Opposition, Plaintiffs submitted declarations from Messrs. Hughes and Arnold. In their declarations, the two experts now state that Plaintiffs' lost profits are the same as DIRECTV's gain. *See* Hughes Decl., ¶ 2 ("my analysis is the same for both [UCL and tortious interference] claims, and require no differentiation between them."); Arnold Decl., ¶ 3 ("There is no difference between the 'damages' outlined in my report and the funds I would opine that

DIRECTV owe to Pegasus as restitution."). However, Plaintiffs' two experts have no analysis to support their conclusions that their restitution analysis would be the same as the damages analysis they appear to have actually conducted. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *see also* Fed. R.Evid. 702 Advisory Committee Notes (*Daubert* requires "more than simply taking the expert's word for it.").

that if the defendant "usurped Saratoga's vested contractual interest in the property, restitution for that interest would be proper." *Id.* at 847. Of course, in such a case, the restitution that Saratoga would get is the profits that the defendant obtained by usurping the business opportunity. Such profits were relatively certain as the Ninth Circuit opinion makes clear in its discussion of the real estate deals that the defendant was engaged in and the profits he garnered from such deals. *See Id.* at 844–45. In contrast, the "restitution" Plaintiffs seek in this case is based on the profits *Plaintiffs* would have received had they been given access to the extra services. Plaintiffs did not look at DIRECTV's profits which would have included its revenues and costs.

At bottom, Plaintiffs are essentially seeking damages, not the return of money in which they have an identifiable property interest. The result of allowing Plaintiffs to recover such relief under their UCL claim would be that "the UCL would be used as an all-purpose substitute for a tort or contract action, something the Legislature never intended." *Korea Supply,* 29 Cal.4th at 1151, 131 Cal.Rptr.2d 29, 63

P.3d 937. Based on the foregoing, the Court finds that Plaintiffs have not raised a genuine issue of material fact whether they have a vested interest in the money they seek to recover from DIRECTV on their Premium and Advanced Services Claims. Therefore, the Court grants DIRECTV's motion for summary judgment on the issue of damages under Plaintiffs' UCL claims based on their Premium and Advanced Services Claims.

 As to the Launch Fees,[35] DIRECTV argues that Pegasus' expert, Mr. Arnold contradicts himself in the declaration filed in support of Plaintiffs' Supplemental Opposition.[36] *See* DIRECTV's Supplemental Reply at 5:5–17. Specifically, DIRECTV proffers the deposition testimony of Mr. Arnold, conducted on February 25, 2003, in which he states that he did not conduct any analysis on Launch Fees, *see* Dean Decl., Exh. 173 at 381:14–382:7; DIRECTV then points to Mr. Arnold's declaration filed in support of Plaintiffs' Supplemental Opposition in which he describes "his Launch Fee analysis," and even goes so far as to testify that he "limited [his] analysis to the funds actually withheld from Pegasus." Arnold Decl.,

**35.** In its Supplemental Brief, DIRECTV did not address the issue of whether Plaintiffs have a vested interest in the money they are seeking on their Launch Fee Claim. DIRECTV, however, addressed this issue in its Supplemental Reply in response to Plaintiffs' Supplemental Opposition. *See* DIRECTV's Supplemental Reply at 5:4–24. The crux of DIRECTV's argument, as discussed *infra*, is that the additional evidence submitted by Plaintiffs in the form of declarations by their two experts should be stricken as sham. Additionally, in footnote 7 of its Supplemental Reply, DIRECTV states that "NRTC was not required to share [the Launch Fees it received from DIRECTV] with Plaintiffs...." *See* DIRECTV's Supplemental Reply at 5–6, fn. 7 (citing Exh. 175 at 337:10–358:8). Exhibit 175 to the Dean Declaration is an excerpt from the deposition of Steven Berman. Preliminarily, the Court presumes that DIRECTV

meant to cite to pages 337 through 338 since only pages 336, 337, 338, 339, 340, 341 and 396 were attached. Nevertheless, the Court reviewed all the Berman deposition testimony attached under Exhibit 175 but found no support for DIRECTV's argument that NRTC was not required to share with Plaintiffs the Launch Fees it received from DIRECTV. Instead, the Berman deposition testimony deals with the issue of whether DIRECTV had received certain Launch Fees and incentives from third-parties and whether it shared them with NRTC.

**36.** DIRECTV also argues that Launch Fees are not part of Plaintiffs' Section 17200 Claim. The Court disagrees. The allegations regarding the Launch Fees were included in Plaintiffs' SAC and incorporated into their Section 17200 Claims. *See, e.g.,* Pegasus' SAC at ¶¶ 33–35, 98 and Prayer ¶ 5.

¶ 6. Thus, DIRECTV concludes, Mr. Arnold's Declaration should be stricken as a sham. *See* DIRECTV's Supplemental Reply at 5:13–17, citing *Disc Golf Ass'n, Inc. v. Champion Discs, Inc.,* 158 F.3d 1002, 1008 (9th Cir.1998). In their Responses to DIRECTV's Evidentiary Objections, filed on May 20, 2003, Plaintiffs direct the Court's attention to Pegasus' Opposition to DIRECTV's Motion in Limine No. 9 ("Opposition to MIL"), wherein Pegasus offers evidence that Mr. Arnold conferred with Mr. Hughes regarding his approach to Launch Fees. *See* Declaration of Alexander Cote in Support of Pegasus' Opposition to MIL ("Cote Decl."), Exh. E at 76:1–18; Arnold Decl. in Support of Pegasus' Opposition to MIL, ¶ 3. Additionally, and as noted in the Opposition to the MIL, Pegasus has also designated Mr. Hughes as its own expert witness. Based on the foregoing, the Court finds that Plaintiffs have raised a genuine issue of material fact whether they have a vested interest in the money they seek to recover from DIRECTV on their Launch Fee Claims.

## V. CONCLUSIONS

Therefore, and based on the above, the Court hereby:

1) GRANTS DIRECTV's motion for summary judgment as to Pegasus' claim 1 in case no. 00–368 for intentional interference with contractual relations, specifically the Member Agreements between NRTC and Pegasus;

2) GRANTS DIRECTV's motion for summary judgment as to Pegasus' claim 2 in case no. 00–368 for intentional interference with prospective economic relationship as between Pegasus and existing and future members;

3) GRANTS DIRECTV's motion for summary judgment as to Pegasus' claim 5 in case no. 00–368 for violation of California Business & Professions Code § 17200 on the basis of "unlawful" act or practice;

4) as to Pegasus' claim 5 in case no. 00–00368 for violation of California Business & Professions Code § 17200 on the basis of "unfair" act or practice: a) GRANTS DIRECTV partial summary judgment on the issue of whether its conduct meets the *Cel–Tech* test, *i.e.,* whether DIRECTV's conduct threatens an incipient violation of antitrust laws, violates the spirit or policy of those laws, or otherwise significantly threatens or harms competition; b) DENIES DIRECTV's motion for partial summary judgment on the issue of whether it competes with Pegasus; and c) DENIES DIRECTV's motion for partial summary judgment on the issue of whether Pegasus, if not a competitor of DIRECTV, must be a member of the general public to allege a UCL "unfair" claim;

5) GRANTS DIRECTV's motion for summary judgment as to Pegasus' claim 5 in case no. 00–368 for violation of California Business & Professions Code § 17200 on the basis of "fraudulent" act or practice;

6) GRANTS DIRECTV's motion for partial summary judgment as to the damages Pegasus is seeking on its claim 5 in case no. 00–368 for violation of the "Unfair" prong of the UCL as to its Premium & Advanced Services Claims;

7) DENIES DIRECTV's motion for partial summary judgment as to the damages Pegasus is seeking on its claim 5 in case no. 00–368 for violation of the "Unfair" prong of the UCL as to Launch Fee Claim;

8) GRANTS DIRECTV's motion for summary judgment as to the Class's claim 1 in case no. 00–2117 for intentional interference with contractual relations, specifically the Member Agreements between NRTC and the Class;

9) GRANTS DIRECTV's motion for summary judgment as to the Class's claim 2 in case no. 00-2117 for intentional interference with prospective economic relationship as between the Class and existing and future members;

10) GRANTS DIRECTV's motion for summary judgment as to the Class's claim 3 in case no. 00-2117 for violation of California Business & Professions Code § 17200 on the basis of "unlawful" act or practice;

11) as to the Class's claim 3 in case no. 00-2117 for *violation of California Business & Professions Code § 17200 on the basis of "unfair" act or practice:* a) GRANTS DIRECTV partial summary judgment on the issue of whether its conduct meets the *Cel-Tech* test, *i.e.,* whether DIRECTV's conduct threatens an incipient violation of antitrust laws, violates the spirit or policy of those laws, or otherwise significantly threatens or harms competition; b) DENIES DIRECTV's motion for partial summary judgment on the issue of whether it competes with the Class; and c) DENIES DIRECTV's motion for partial summary judgment on the issue of whether the Class, if not a competitor of DIRECTV, must be a member of the general public to allege a UCL "unfair" claim;

12) GRANTS DIRECTV's motion for summary judgment as to the Class's claim 3 in case no. 00-2117 for violation of California Business & Professions Code § 17200 on the basis of "fraudulent" act or practice; and

13) GRANTS DIRECTV's motion for partial summary judgment as to the damages the Class is seeking on its claim 3 in case no. 00-2117 for violation of the "Unfair" prong of the UCL as to their Premium and Advanced Services Claims.

14) DENIES DIRECTV's motion for partial summary judgment as to the damages the Class is seeking on its claim 3 in case no. 00-2117 for violation of the "Unfair" prong of the UCL as to their Launch Fee Claim.

**IT IS SO ORDERED.**

**ORDER GRANTING IN PART AND DENYING IN PART PEGASUS' AND THE CLASS'S MOTION FOR PARTIAL RECONSIDERATION OF THE COURT'S ORDER RE DIRECTV'S SUMMARY JUDGMENT MOTION NO. 2; AND GRANTING AGAIN DIRECTV'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

This matter involves five cases dealing with DIRECTV, Inc. ("DIRECTV") that have been consolidated before this Court.[1] By order dated May 22, 2003, this Court issued its ruling regarding DIRECTV's Motion for Summary Judgment No. 2 (the "Motion No. 2 Order"). Presently before the Court is a motion for partial reconsideration of the Motion No. 2 Order filed by plaintiffs Pegasus Satellite Television, Inc., Golden Sky Systems, Inc.,[2] and class representatives Iowa Lakes Electric Cooperative and North Central Communications and the individual members of the class[3] (collectively "Plaintiffs").

---

1. The five cases are CV 99-5666, CV 99-8672, CV 00-368, CV 00-2117 and CV 01-6220.

2. Pegasus Satellite Television, Inc. and Golden Sky Systems, Inc. are collectively referred to as "Pegasus."

3. The class representatives Iowa Lakes Electric Cooperative and North Central Communications and the individual members of the class are collectively referred to as "the Class."

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts surrounding this litigation are set forth in the Court's Motion No. 2 Order and will not be repeated here. Following the Court's ruling on DIRECTV's Motion No. 2, Plaintiffs, on May 27, 2003, filed an *ex parte* application seeking leave to file a motion for partial reconsideration of the Court's Motion No. 2 Order. The Court granted Plaintiffs' *ex parte* application and deemed Plaintiffs' motion for partial reconsideration filed ("Motion for Reconsideration"). DIRECTV filed its opposition on May 29, 2003. Plaintiffs filed their reply on May 30, 2003. The Court now rules on Plaintiffs' Motion for Reconsideration.

## III. LEGAL STANDARDS

### A. Legal Standards

#### 1. Motion for reconsideration standard

Under California Central District Local Rule 7–18, a motion for reconsideration of the decision on any motion may be made on the grounds of:

(a) a material difference in fact or law from that presented to the Court before such decision that in the exercise of reasonable diligence could not have been known to the party moving for reconsideration at the time of such decision, or (b) the emergence of new material facts or a change of law occurring after the time of such decision, or (c) a manifest showing of a failure to consider material facts presented to the Court before such decision.

Local Rule 7–18.

▉ Additionally, an interlocutory decision, such as a grant of partial summary judgment, is not final and may be considered at any time. *Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 744, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976) (order granting partial summary judgment is interlocutory); *St. Paul Fire & Marine Ins. Co. v. F.H.,* 55 F.3d 1420, 1425 (9th Cir.1995) (partial summary judgment is not a final judgment and is subject to reconsideration on proper motion).

#### 2. Available monetary relief under the UCL

▉ California Business & Professions Code Section 17203 states that:

[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The Court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, *..., or as may be necessary to restore to any person in interest any money or property, which may have been acquired by means of such unfair competition.*

Cal. Bus. & Prof.Code § 17203 (emphasis added). As the Court noted in its Motion No. 2 Order, "[d]amages [under Business & Professions Code § 17203] are not available...."[4] Motion No. 2 Order at 1078. An order for restitution, which is available under the Business & Professions Code Section 17203, is one "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is to persons who have an ownership interest in the property or those claiming through that person." *Kraus v. Trinity Mgmt. Servs.,* 23 Cal.4th

---

**4.** California Civil Code § 3281 defines damages as follows:

Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault compensation therefor in money, which is called damages.

Cal.Civ.Code § 3281.

116, 96 Cal.Rptr.2d 485, 999 P.2d 718 (2000). Restitution measures the remedy by the defendants' gain," whereas "damages" "measures the plaintiff's loss." 1 D. Dobbs, *Dobbs Law of Remedies* § 4,1(1) at 555.

Disgorgement, on the other hand, "is a broader remedy than restitution," and "may include a restitutionary element, but is not so limited." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1145, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003) (internal quotations omitted). Thus, "an order for disgorgement may compel a defendant to surrender all money obtained through an unfair business practice even though not all is to be restored to the persons from whom it was obtained or those claiming under those persons." *Id.* Alternatively, an order for disgorgement "has also been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of unfair practice." *Id.*

Under California law, a UCL claim may be brought by: 1) an individual on his own behalf ("an individual action"), 2) an individual who "seeks disgorgement or restitution on behalf of persons other than or in addition to the plaintiff," ("a representative action") or 3) an individual on behalf of himself and all others similarly situated ("a class action"). *Kraus*, 23 Cal.4th at 126 and n. 10, 96 Cal.Rptr.2d 485, 999 P.2d 718. In *Kraus*, the California Supreme Court held that, while restitution is an available remedy under the UCL, disgorgement of money obtained through an unfair business practice is an available remedy in a representative action only to the extent that it constitutes restitution, *i.e.*, nonrestitutionary disgorgement is not available in a representative action. *See Kraus*, 23 Cal.4th at 136–37, 96 Cal.Rptr.2d 485, 999 P.2d 718. In *Korea Sup-*

*ply*, the California Supreme Court extended the holding of *Kraus* to individual actions under the UCL. *See Korea Supply*, 29 Cal.4th at 1145, 131 Cal.Rptr.2d 29, 63 P.3d 937 ("We reaffirm [the holding in *Kraus* ] here in the context of an individual action under the UCL.").

In *Kraus*, the Court noted that disgorgement is an authorized remedy in class actions. *Kraus*, 23 Cal.4th at 137, 96 Cal.Rptr.2d 485, 999 P.2d 718. The *Korea Supply* Court, while acknowledging the statement made by the *Kraus* Court as to the availability of nonrestitutionary disgorgement in class actions, expressly declined to reach that issue since it was not before it. *Korea Supply*, 29 Cal.4th at 1148 n. 6, 131 Cal.Rptr.2d 29, 63 P.3d 937.

In its Motion No. 2 Order, this Court made no distinction between the relief that Pegasus and the Class may seek under their UCL Claims, *i.e.*, the Court considered that both Pegasus and the Class can only get restitution. Indeed, no such distinction was previously made by the parties themselves. However, in their Reply to the instant Motion for Reconsideration, Plaintiffs for the first time suggest that the Class may be entitled to nonrestitutionary disgorgement under *Kraus*. *See* Mem. of P's & A's in Support of Motion for Reconsideration at 3 n. 2. Plaintiffs, however, go on to say that "[b]ecause the Class has voluntarily instructed its expert to limit his analysis to sums to which the Class is entitled to restitution, and because the Class is confident that, upon reconsideration, the Court will understand that the Class does have a vested interest in the limited subset of funds that it seeks to disgorge from DIRECTV, the Class is content to demonstrate that it also has a claim of restitution to all of the money it seeks to recover, even though it is not legally required to make such a showing." *Id.* Thus, Plaintiffs essentially admit that al-

though the Class may be entitled to non-restitutionary disgorgement, it has instructed its damages expert to limit his analysis to restitutionary amounts. Of course, this does not change the fact that damages are not available under a UCL claim—not even to the Class.

## IV. ANALYSIS

### A. The Court's Motion No. 2 Order:

In its Motion No. 2 Order, the Court, among other things, granted partial summary judgment in favor of DIRECTV as to the damages Plaintiffs are seeking on their California Unfair Competition Claims. In doing so, the Court relied extensively on the recent California Supreme Court decision in *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 131 Cal.Rptr.2d 29, 63 P.3d 937 (2003). The Court initially stated that since "Plaintiffs are not seeking the return of money that was once in their possession, ..., the Court's inquiry must focus on the second test under *Korea Supply*—whether Plaintiffs have a vested interest in the money they seek to recover from DIRECTV." Motion No. 2 Order at 1079–80. The Court then stated that "[i]n the absence of an identifiable and vested interest in particular funds in DIRECTV's possession, Plaintiffs have a damage claim or a non-restitutionary disgorgement claim, both of which are barred under *Korea Supply*." *Id.* at 1080. The Court then looked at the reports submitted by Plaintiffs' experts and other documents submitted by Plaintiffs and concluded that Plaintiffs are seeking damages and not restitution. The Court granted partial summary judgment in favor of DIRECTV after holding that "Plaintiffs have not raised a genuine issue of material fact whether they have a vested interest in the money seek to recover from DIRECTV on their Premium and Advanced Services Claims." *Id.* at 1082.

### B. Plaintiffs' Motion for Reconsideration:

In the instant Motion for Reconsideration, Plaintiffs argue that the Court should reconsider its rulings granting DIRECTV's motion for partial summary judgment with respect to Plaintiffs' UCL claims "because the [Motion No. 2] Order reveals that the Court overlooked or misunderstood certain material facts by Pegasus and the Class in Opposition to [DIRECTV's summary judgment] motion." Pls.' Mem. of P's & A's in Support of Motion for Reconsideration at 4:18–21. Specifically, and as to the first test under *Korea Supply*, Plaintiffs contend that the Court "failed to consider the two Seamless Consumer Program Agreements and the declarations explaining how, pursuant to those agreements, Pegasus and the Class *have been in possession of all of the Premium Services revenues* generated in their territories since the Seamless Consumer Program Agreements became effective." *Id.* at 6:12–16 (emphasis in original). Plaintiffs point to footnote 29 in the Motion No. 2 Order where the Court characterizes as "novel" Plaintiffs' argument that certain revenues they paid to DIRECTV under the "Seamless Marketing Agreement" satisfy the first ground for restitution under *Korea Supply*. Thus, Plaintiffs go on to argue that, in referencing the Seamless *Marketing* Agreement instead of the Seamless *Consumer* Agreement, the Court "either overlooked, or made an error in considering, the material facts provided by Pegasus and the Class in support of their Supplemental Opposition to show how a significant portion of the Premium Services revenues come within the first basis for restitution under *Korea Supply*." *Id.* at 8:1–4.

■ The Court did indeed assume that the Seamless Marketing Program Agreement and the Seamless Consumer Pro-

gram Agreement are one of the same.[5] However, Plaintiffs' Motion for Reconsideration makes it clear that the Seamless Consumer Program Agreement is a completely separate agreement under which Plaintiffs collected Premium Services subscriber fees and passed a portion of those fees to DIRECTV. *See* Declaration of David Eisen in Support of Application for Leave to File Motion for Partial Reconsideration ("Eisen Decl."), Exhs. A, B & C. Such an arrangement is indeed a material fact as it is relevant to the first test under *Korea Supply*—whether Plaintiffs are seeking the return of money that was once in their possession.[6] Therefore, the Court grants Plaintiffs' Motion for Reconsideration on the issue of whether the first test under *Korea Supply* has been met.

■ As to the second test under *Korea Supply*, Plaintiffs contend that "[t]he Court's conclusion that Pegasus and the Class seek to recover through their UCL restitution claims 'expectation' damages is based upon a misunderstanding of the nature of Plaintiffs' UCL claims, which misunderstanding, in turn, must be premised upon a failure to consider the relevant portions of the expert declarations submitted in support of the Supplemental Opposition." *Id.* at 14:27–15:3. Specifically, Plaintiffs state, "it is not the contention of Pegasus and the Class that they 'would have sold exactly the same amount of programming as DIRECTV for exactly the same amount of money.'" *Id.* at 15:3–6 (citing Motion No. 2 Order at 1080). Rather, Plaintiffs go on to say, "Pegasus and the Class contend that they have the exclusive right to deal with *all* subscribers in their territories, such that they are entitled to restitutionary disgorgement of *all money actually received by DIRECTV* for the sale and distribution of the Premium and Advanced Services to Plaintiffs' subscribers, regardless of whether Pegasus and the Class would have been more or less successful with respect to the sale of those services." *Id.* at 15:8–13 (emphasis in original). After citing to the declarations of their two experts, Plaintiffs state that "for the Court to have concluded that the UCL restitution claims of Pegasus and the Class are based upon an 'expectation' that they 'would have sold exactly the same amount of programming as DIRECTV for exactly the same of money,' and that [the two experts] Hughes and Arnold calculated lost profits based on 'estimated' subscriber numbers and revenues, it must have failed to consider these material facts regarding the nature and methodology of the analyses conducted by Hughes and Arnold." *Id.* at 16:9–14.

■ Preliminarily, the Court finds it helpful to delineate its analysis in the Motion No. 2 Order with regard to the second test under *Korea Supply*. The Court began its analysis by distinguishing between a vested interest and a contingent interest. *See* Motion No. 2 Order at 1080. The Court stated that a vested interest is "one that is 'unconditional,' 'absolute,' and 'not contingent.'" *Id.* at 1080. On the other hand, a contingent interest, "is dependent upon an uncertain event." *Id.* at 1080. After discussing the requirement under *Korea Supply* that the funds to be recovered from a defendant be identifiable,[7] the Court stated that:

taching the Seamless Consumer Program Agreement).

6. However, and as discussed below, mere possession is not sufficient to meet the first test under *Korea Supply*.

7. Of course, there is no requirement that Plaintiffs point to a particular bank account

---

5. Incidentally, in their Motion to Sever the Seamless Marketing Agreement Case, the Class plaintiffs attached the Seamless Consumer Program Agreement to their briefs instead of the Seamless Marketing Program Agreement. *See* Declaration of Gregory A. Nylen, ¶ 3 and Exh. A (referencing the Seamless Marketing Program Agreement, but at-

[i]n this case, Plaintiffs' experts did not identify particular funds or monies to which Plaintiffs were allegedly entitled. Instead the experts estimated Plaintiffs' lost profits using percentages for estimated subscriber numbers and revenues. Plaintiffs essentially seek to recover expectation damages for what they believe they would have obtained "if DIRECTV had performed in accordance with the DBS Agreements...." Indeed, Plaintiffs seek the same monetary relief as to their two business tort claims, which the Court has granted DIRECTV summary judgment on, and their Section 17200 Claim. Plaintiffs do not deny what they are doing; instead, they argue that damages and restitution claims can equal the same dollar amount. However, ... "[r]estitution measures the remedy by the defendant's gain," whereas "damages" "measures the plaintiff's loss." DIRECTV has offered evidence to show that none of Plaintiffs' experts did attempt to measure DIRECTV's gain. To do so, the experts would be required to analyze DIRECTV's revenues and costs. Instead, Mr. Hughes looked at costs peculiar to the Class, such as the margin NRTC would have charged the Class for programming and the Class's incremental operations costs. For his part, Mr. Arnold created a "premium services damages model" to calculate the "profits Pegasus would have received from selling the premium services...." Mr. Arnold then went to look at costs peculiar to Pegasus, including the royalty rate Pegasus would have owed to DIRECTV and Pegasus' bad debt experience with

its subscribers. Neither Mr. Hughes nor Mr. Arnold attempted to analyze DIRECTV's costs for the sale of the Premium or Advanced Services.

. . .

At bottom, plaintiffs are essentially seeking damages, not the return of money in which they have an identifiable property interest. The result of allowing Plaintiffs to recover such relief under their UCL claim would be that "the UCL would be used as an all-purpose substitute for a tort or contract action, something the Legislature never intended."

Motion No. 2 Order at 1080–82 (internal citations omitted). Thus, and as is clear from the Court's analysis, partial summary judgment was granted in favor of DIRECTV after the Court concluded that Plaintiffs were seeking damages—a remedy not allowed under the UCL.

In the instant Motion for Reconsideration, Plaintiffs assign error to this Court for the alleged failure to fully consider their two experts' "newly enlightened" declarations. Contrary to Plaintiffs' assertion, the Court did indeed consider the declarations of Plaintiffs' experts, Hughes and Arnold. *See* Motion No. 2 Order at 1081 n. 34. The Court also concluded that "Plaintiffs' two experts have no analysis to support their conclusions that their restitution analysis would be the same as the damages analysis they appear to have actually conducted."[8] *Id.* That was true then, and it is true now. Plaintiffs, in the instant motion, point to the Hughes Declaration where the expert states that his

---

where the funds they seek are located. Instead, all that is necessary is that Plaintiffs show that there is a quantifiable amount of money in the possession of the defendant. *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706 (2000).

8. Incidentally, in the two declarations submitted by the experts, and although both state that their analyses were based on the amounts that DIRECTV would have received, there are no citations to any part of their reports that would support their new assertions.

"analysis calculated actual, non-hypothetical amounts that DIRECTV has actually received from customers in NRTC territories." Mem. of P's & A's in Support of Motion for Reconsideration at 15:16–18 (quoting Hughes Decl., ¶ 2). Likewise, Plaintiffs point to a portion of the Arnold Declaration where the expert states that his analysis was similarly limited "to the actual profits that DIRECTV received from actual Premium and Advanced Services subscribers." *Id.* at 15:23 (quoting Arnold Decl., ¶ 2 & 5). Thus, relying on these statements, Plaintiffs now argue that they are only seeking restitution because "[t]hese calculations were based on the actual, exact revenue and subscriber data received from DIRECTV during discovery." *Id.* That, however, does not carry the day for Plaintiffs. It is what they did with these subscriber figures that determines whether Plaintiffs are seeking restitution or damages, *i.e.,* whether the experts looked at DIRECTV's gains (restitution) or Plaintiffs' losses (damages).

■ In his restitution report,[9] Arnold states that as to the Premium Services restitution, "[t]he damages suffered in this category reflect the amount of income Pegasus lost due to its inability to offer the Premium services *on the same terms it [i.e., Pegasus] offered all other services to its subscribers.*" Dean Decl., Exh. 167, Arnold Report at 3 (emphasis added). Arnold goes on to discuss his "Premium Services Damages Model" and states that "the model for Premium Services is based on profits Pegasus would have received from selling the Premium Services ...." *Id.* In the "Premium Services Damages Model" itself, Arnold looks at Pegasus' estimated bad debt and the Royalty that Pegasus has to pay DIRECTV to come up with Pegasus' "lost profits." *Id.* at 4; *see also id.* at

6 ("The bad debts were based on the Pegasus company-wide experience per month during both the pre-SCP period and the SCP period and were available and produced by Pegasus.... The amounts retained by Pegasus from Premium services during the SCP period were available and produced by Pegasus."). As to Advanced Services, Arnold states: "It is my expert opinion that DIRECTV has damaged Pegasus in the amount of $2,112,770 by depriving Pegasus of the opportunity to offer TiVo service in its territory...." *Id.* at 6. Arnold goes on to say that "Pegasus would have received incremental revenue per month from its subscribers to the TiVo service ... The contribution margin from TiVo subscribers ... I estimated from data available and produced by Pegasus, would also accrue to Pegasus." *Id.* at 7. Thus, Arnold only looked at Pegasus' lost business opportunity as a result of DIRECTV's withholding the Premium and Advanced Services. But, "[c]ompensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." *Korea Supply,* 29 Cal.4th at 1151, 131 Cal.Rptr.2d 29, 63 P.3d 937 (quoting *MAI Systems Corp. v. UIPS,* 856 F.Supp. 538, 542 (N.D.Cal. 1994)).

Likewise, in his restitution report, Hughes looked at costs peculiar to the Class and *not* DIRECTV, such as the margin NRTC would have charged the Class for programming and the Class's incremental operations costs. *See* Dean Decl., Exh. 168 at 4–23.

In sum, the Court, in its Motion No. 2 Order, fully considered all facts material to Plaintiffs' claim that they have a vested interest in the funds they are seeking from DIRECTV. Plaintiffs' instant Motion for

---

9. The Court will assume that the two experts meant to say "restitution" instead of "damages" in their reports, and will refer to them as such. However, and as already noted, labels alone will not carry the day.

Reconsideration adds nothing new as to that issue.

At Oral Argument, on June 2, 2003, Plaintiffs' counsel argued that the Court has erroneously focused on the measure of restitution Plaintiffs are seeking, including the reports by the experts, to deny Plaintiffs their relief under their UCL Claims. Plaintiffs' argument misconstrues the bases for the Court's holding. As the *Korea Supply* Court stated:

> The nonrestitutionary disgorgement remedy sought by plaintiff closely resembles a claim for damages, something that is not permitted under the UCL. As one court has noted: "Compensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims." Plaintiff suggests that its disgorgement remedy need not include *all* of the profits unfairly obtained by Lockheed Martin; instead, its recovery might be limited to the amount it allegedly would have obtained as a commission had MacDonald Dettwiler been awarded the contract. This proposed recovery would be exactly the same amount that plaintiff is seeking to recover as damages for its traditional tort claim of interference with prospective economic advantage.

*Korea Supply*, 29 Cal.4th at 1150–51, 131 Cal.Rptr.2d 29, 63 P.3d 937 (internal cita-

tion omitted) (emphasis in original). Likewise, in this case, and as the Court noted in its Motion No. 2 Order, Plaintiffs are not entitled to monetary relief on their UCL Claims because the remedy they are seeking closely resembles a claim for damages—something not allowed under the UCL. *See* Motion NO. 2 Order at 1080–82. In reaching that conclusion, the Court did not simply look at the reports submitted by Plaintiffs' experts. Instead, the Court noted that Plaintiffs are essentially seeking "to recover their expectation damages for what they would have obtained 'if DIRECTV had performed in accordance with the DBS Agreements....'" Motion No. 2 Order at 1080 (quoting Further Supplemental Responses to Directv's Damages Interrogatories at 3:18–19 & 3:24–25). The Court also noted that Plaintiffs are seeking the same monetary relief on their two business torts and their UCL Claims.[10] *Id.* at 1080. The instant ruling on Plaintiffs' Motion For Reconsideration discusses the reports and the declarations of the two experts simply because, in their moving Papers, Plaintiffs alleged that the Court failed to consider material facts previously submitted to the Court—the declarations of the two experts Hughes and Arnold.

Therefore, the Court denies Plaintiffs' Motion for Reconsideration on the issue of

---

**10.** In their Motion for Reconsideration Plaintiffs cite to the Court's 1999 Order Denying NRTC's Motion for a Preliminary Injunction and state that:

> the Court's various rulings lead to the incongruous result that the Court denied the injunctive relief that would have permitted the Plaintiffs to reap the benefits of the distribution of the Premium and Advanced Services during the pendency of this litigation on the basis that they eventually could be made whole by monetary remedies; only to rule subsequently, years later that, as a matter of law, Pegasus and the Class are not entitled to any monetary remedy even should they prevail at trial.

Pls.' Mem. of P's & A's in Support of Motion for Reconsideration at 22:18–25. The Court notes that Plaintiffs' statement fails to recognize that the legal landscape has changed since 1999 to the detriment of Plaintiffs. *See* Motion No. 2 Order at 12–23 (citing *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825 (9th Cir.2001) and granting summary judgment in favor of DIRECTV as to Plaintiffs' interference business torts); *see also id.* at 35–43 (citing *Korea Supply*, 29 Cal.4th at 1149–1151, 131 Cal.Rptr.2d 29, 63 P.3d 937 and granting summary judgment in favor of DIRECTV as to the monetary relief Plaintiffs are seeking on their UCL Claims.).

whether Plaintiffs meet the second test under *Korea Supply, i.e.*, whether they have a vested interest in the funds they are seeking from DIRECTV.

### C. The Seamless Consumer Program Agreements (the "SCP Agreements"):

There are two SCP Agreements that were entered into by the parties on August 9, 2000—one between NRTC and DI-RECTV, the other between Pegasus and DIRECTV. Eisen Decl., Exhs. A & B. "From the time DIRECTV obtained the right to distribute the premiums in or about May 1999, until approximately August 2000, DIRECTV sold the premiums ... directly to NRTC subscribers in NRTC territories...." Declaration of Ted Lodge ("Lodge Decl."), ¶ 2. From approximately May 1999 to August 2000, the subscribers to the Premium Services in NRTC territories received customer service, including two bills, from two·different service providers: Pegasus and the members of the Class for most DIRECTV services (non-Premium services), and DI-RECTV for the Premium Services. *Id.* ¶ 3. This caused substantial confusion to subscribers and unnecessary additional administrative burden on DIRECTV, the Class members and Pegasus. *Id.; see also* Declaration of Bob Phillips ("Phillips Decl."), ¶ 6. Accordingly, in August of 2000, the parties entered into the SCP Agreements. *Id.* Under these agreements, Pegasus and the Class members became sales agents for the Premium Services in their respective territories. Lodge Decl., ¶ 3; Phillips Decl., ¶ 7. Under the SCP Agreements, Pegasus and the Class members provide "at [their] sole cost, all billing, customer care and sales and marketing with respect to the delivery of [the Premium services] to customers in

[their] territories." Lodge Decl., ¶ 4. Pursuant to the SCP Agreements, Pegasus and the Class members keep between ten to twenty percent of the revenues they collect, with the remainder turned over to DIRECTV. Lodge Decl., ¶ 4, Phillips Decl., ¶ 7.

### D. Whether Plaintiffs Meet the First Test Under *Korea Supply?*

 In their Reply in Support of their Motion for Reconsideration, Plaintiffs take the position that, because they possessed the revenues from the SCP Agreements before turning them over to DIRECTV, they are entitled to restitution pursuant to the first *Korea Supply* test.[11] *See* Mem. of P's & A's in Support of Pls.' Reply at 6:11–13. In *Korea Supply*, the Court, after citing to *Kraus* for the definition of a "person in interest" as a person "who had an ownership interest in the property or those claiming through that person," *Korea Supply*, 29 Cal.4th at 1149, 131 Cal. Rptr.2d 29, 63 P.3d 937, stated:

> The remedy sought by plaintiff in this case is not restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants. First it is clear that plaintiff is not seeking the return of money or property that was once in its possession.... Any award that plaintiff would recover from defendants would not be restitutionary as it would not replace any money or property that defendants took directly from plaintiff. Further, the relief sought by plaintiff is not restitutionary under an alternative theory because plaintiff has no vested interest in the money it seeks to recover.

*Id.* at 1149, 131 Cal.Rptr.2d 29, 63 P.3d 937. Reading this language closely, it is evident that the two restitution "tests" ar-

---

**11.** In its Tentative Order, issued prior to Oral Argument on June 2, 2003, this Court also considered whether mere possession can be enough to support a claim for restitution.

ticulated by the California Supreme Court are as follows: 1) the plaintiff has an ownership interest in and possessed the property before giving it to the defendant (a "possessory ownership interest"), or 2) the plaintiff did not possess the property, but has a vested ownership interest in it (a "non-possessory but vested ownership interest").[12]

■ In this case, Plaintiffs have offered as evidence the SCP Agreements pursuant to which Plaintiffs have collected Premium Services revenues and then turned over eighty to ninety percent of such revenues to DIRECTV. Thus, Plaintiffs have offered evidence to show that they did indeed possess some of the revenues they seek to recapture from DIRECTV. Mere possession, as Plaintiffs acknowledged at Oral Argument, is not however enough to meet the first test under *Korea Supply*. Plaintiffs must still show that they have an ownership interest in the property. Plaintiffs do not contend that the SCP Agreements give them an ownership interest in the revenues they are seeking.[13] Instead, at Oral Argument, Plaintiffs took the position that their property interest in the post-SCP Agreement funds arises as a result of their right to the exclusive distribution of the Premium Services under the Member Agreement. This however is the same argument the Court rejected in relation to whether Plaintiffs have a vested property interest pursuant to the second test under *Korea Supply*, i.e., whether Plaintiffs have a non-possessory but vested interest in the revenues they are seeking. In summary, while the SCP Agreement allows Plaintiffs to pos-

sess some of the revenues to the Premium Services, it does not provide them with an ownership interest in those revenues. Thus, Plaintiffs do not meet the first test under *Korea Supply*.

Based on the foregoing, the Court finds that Plaintiffs have not raised a genuine issue of material fact whether they have an ownership interest in the post-SCP Agreement revenues. Therefore, the Court again grants partial summary judgment in favor of DIRECTV as to the damages Pegasus and the Class are seeking on their claims based on the "unfair" prong of the UCL as to the Premium and Advanced Services.

## V. CONCLUSIONS:

Based on the foregoing, the Court hereby:

1) Grants Plaintiffs' Motion for Reconsideration on the issue of whether the first test under *Korea Supply* has been met;

2) Denies Plaintiffs' Motion for Reconsideration on the issue of whether the second test under *Korea Supply* has been met;

3) again GRANTS DIRECTV's motion for partial summary judgment as to the damages Pegasus is seeking on its claim 5 in case no. 00–368 for violation of the "Unfair" prong of the UCL as to the Premium and Advanced Services; and

4) again GRANTS DIRECTV's motion for partial summary judgment as to the damages the Class is seeking on its claim 3 in case no. 00–2117 for violation

---

**12.** As the *Korea Supply* Court noted, an example of a vested ownership interest is the earned wages that are due and payable as in *Cortez*, 23 Cal.4th at 178, 96 Cal.Rptr.2d 518, 999 P.2d 706.

**13.** Under the SCP Agreements, Pegasus and the Class members act as sales agents for

DIRECTV. *See* Eisen Decl., Exh. B, SCP Agreement at § B.1 ("In its role as sales agent, NRTC shall be responsible for providing at its sole cost, all billing, customer care and sales marketing activities with respect to delivery of such Added Services in NRTC Territories.").

of the "Unfair" prong of the UCL as to the Premium and Advanced Services.

**IT IS SO ORDERED.**